# EXHIBIT A



**Farnam Street**
FINANCIAL

Lease Agreement Number MA090822

# LEASE AGREEMENT

This Lease Agreement, dated September 8, 2022 by and between FARNAM STREET FINANCIAL, INC. (the "Lessor") with an office located at 5850 Opus Parkway, Suite 240, Minnetonka, MN 55343 and MAYA MD INC. (the "Lessee") with an office located at 10330 Apache Blue Avenue, Las Vegas, NV 89135-1477.

Lessor hereby leases or grants to the Lessee the right to use and Lessee hereby rents and accepts the right to use the equipment (identified by serial number where serialized), services, and software on the Lease Schedule(s) attached hereto or incorporated herein by reference from time to time (collectively, the equipment, software and services are the "Equipment"), subject to the terms and conditions hereof, as supplemented with respect to each item of Equipment by the terms and conditions set forth in the appropriate Lease Schedule. The term "Lease Agreement" shall include this Lease Agreement and the various Lease Schedule(s) identifying each item of Equipment or the appropriate Lease Schedule(s) identifying one or more particular items of Equipment.

**1. TERM:** This Lease Agreement is effective from the date it is executed by both parties. The term of this Lease Agreement, as to all Equipment designated on any particular Lease Schedule, shall commence on the Installation Date for all Equipment on such Lease Schedule and shall continue for an initial period ending that number of months from the Commencement Date as set forth in such Lease Schedule (the "Initial Term") and shall continue from year to year thereafter until terminated. The term of this Lease Agreement as to all Equipment designated on any particular Lease Schedule may be terminated without cause at the end of the Initial Term or any year thereafter by either party mailing written notice of its termination to the other party not less than one-hundred twenty (120) days prior to such termination date.

**2. COMMENCEMENT DATE:** The Installation Date for each item of Equipment shall be the day said item of Equipment is installed at the Location of Installation, ready for use, and accepted in writing by the Lessee. The Commencement Date for any Lease Schedule is the first of the month following installation of all the Equipment on the Lease Schedule, unless the latest Installation Date for any Equipment on the Lease Schedule falls on the first day of the month in which case that is the Commencement Date. The Lessee agrees to complete, execute and deliver a Certificate(s) of Acceptance to Lessor upon installation of the Equipment.

**3. LEASE CHARGE:** The lease charges for the Equipment leased pursuant to this Lease Agreement shall be the aggregate "Monthly Lease Charge(s)" as set forth on each and every Lease Schedule executed pursuant hereto (the aggregate "Monthly Lease Charge(s)" are the "Lease Charges"). Lessee agrees to pay to Lessor the Lease Charges in accordance with the Lease Schedule(s), and the payments shall be made at Lessor's address indicated thereon. The Lease Charges shall be paid by Lessee monthly in advance with the first full month's payment due on the Commencement Date. If the Installation Date does not fall on the first day of a month, the Lease Charge for the period from the Installation Date to the Commencement Date shall be an amount equal to the "Monthly Lease Charge" divided by thirty (30) and multiplied by the number of days from and including the Installation Date to the Commencement Date and such amount shall be due and payable upon receipt of an invoice from Lessor. Charges for taxes made in accordance with Section 4 and charges made under any other provision of this Lease Agreement and payable by Lessee shall be paid to Lessor at Lessor's address specified on the Lease Schedule(s) on the date specified in invoices delivered to Lessee. If payment, as specified above, is not received by Lessor on the due date, Lessee agrees to and shall, to the extent permitted by law, pay on demand, as a late charge, an amount equal to one and one-half percent (1½%), or the maximum percentage allowed by law if less, of the amount past due ("Late Charges"). Late Charges shall be charged and added to any past due amount on the date such payment is due and every thirty (30) days thereafter until all past due amounts are paid in full to Lessor.

**4. TAXES:** In addition to the Lease Charges set forth in Section 3, the Lessee shall reimburse Lessor for all license or registration fees, assessments, sales and use taxes, rental taxes, gross receipts taxes, personal property taxes and other taxes now or hereafter imposed by any government, agency, province or otherwise upon the Equipment, the Lease Charges or upon the ownership, leasing, renting, purchase, possession or use of the Equipment, whether the same be assessed to Lessor or Lessee (the "Taxes"). Lessor shall file all property tax returns and pay all Taxes when due. Lessee, upon notice to Lessor, may, in Lessee's own name, contest or protest any Taxes, and Lessor shall honor any such notice except when in Lessor's sole opinion such contest is futile or will cause a levy or lien to arise on the Equipment or cloud Lessor's title thereto. Lessee shall, in addition, be responsible to Lessor for the payment and discharge of any penalties or interest as a result of Lessee's actions or inactions. Nothing herein shall be construed to require Lessee to be responsible for any federal or state taxes or payments in lieu thereof, imposed upon or measured by the net income of Lessor, or state franchise taxes of Lessor, or except as provided hereinabove, any penalties or interest resulting from Lessor's failure to timely remit such tax payments.

**5. DELIVERY AND FREIGHT COSTS:** Lessee shall accept delivery and install the Equipment before such time as the applicable vendor requires payment for such Equipment.

All transportation charges upon the Equipment for delivery to Lessee's designated Location of Installation are to be paid by Lessee. All rigging, drayage charges, structural alterations, rental of heavy equipment and/or other expense necessary to place the Equipment at the Location of Installation are to be promptly paid by Lessee.

**6. INSTALLATION:** Lessee agrees to pay for the actual installation of the Equipment at Lessee's site. Lessee shall make available and agrees to pay for all costs associated with providing a suitable place of installation and necessary electrical power, outlets and air conditioning required for operating the Equipment as defined in the Equipment manufacturer's installation manual or instructions. All supplies consumed or required by the Equipment shall be furnished and paid for by Lessee.

**7. RETURN TO LESSOR:** On the day following the last day of the lease term associated with a Lease Schedule (the "Return Date"), Lessee shall cause and pay for all the Equipment (by serial number where serialized) on that Lease Schedule to be deinstalled, packed using the manufacturer's original packing materials and shipped to the location(s) designated in writing by Lessor (the "Return Location"). If all the Equipment on the applicable Lease Schedule is not at the Return Location within ten (10) days of the Return Date, or Lessee fails to deinstall and ship all the Equipment on the Return Date, then any written notice of termination delivered by Lessee shall become void, and the Lease Schedule shall continue in accordance with this Lease Agreement. Irrespective of any other provision hereof, Lessee will bear

the risk of damage from fire, the elements or otherwise until delivery of the Equipment to the Return Location. At such time as the Equipment is delivered to the Lessor at the Return Location, the Equipment will be at the risk of Lessor. In the case of Equipment that is software or related implementation services, Lessee will erase, delete and destroy all electronic incidents of software, and deliver to Lessor all tangible items constituting software. At Lessor's request, Lessee will also certify in a written form acceptable to Lessor that: (i) all tangible Software has been delivered to Lessor; (ii) all intangible records have been destroyed; (iii) Lessee has not retained the software in any form; (iv) Lessee will not use the Software after the termination date of a Lease Schedule; and (v) Lessee has not received from the software supplier(s) anything of value relating to or in exchange for Lessee's use, rental or possession of the software during the duration of the applicable Lease Schedule (including a trade-in, substitution or upgrade allowance).

**8. MAINTENANCE:** Lessee, at its sole expense, shall maintain the Equipment in good working order and condition. Lessee shall enter into, pay for and maintain in force during the entire term of any Lease Schedule, a maintenance agreement with the original manufacturer of the Equipment providing for continuous uninterrupted maintenance of the Equipment (the "Maintenance Agreement"). Lessee will cause the manufacturer to keep the Equipment in good working order in accordance with the provisions of the Maintenance Agreement and make all necessary adjustments and repairs to the Equipment. The manufacturer is hereby authorized to accept the directions of Lessee with respect thereto. Lessee agrees to allow the manufacturer full and free access to the Equipment. All maintenance and service charges, whether under the Maintenance Agreement or otherwise, and all expenses, if any, of the manufacturer's customer engineers incurred in connection with maintenance and repair services, shall be promptly paid by Lessee. Lessee warrants that all of the Equipment shall be in good working order operating according to manufacturer's specification and eligible for the manufacturer's standard maintenance agreement upon delivery to and inspection and testing by the Lessor. If the Equipment is not operating according to manufacturer's specification, in good working order and/or certified by the manufacturer as eligible for the manufacturer's standard maintenance agreement, Lessee agrees to reimburse Lessor for all costs, losses, expenses and fees associated with such equipment and the repair or replacement thereof.

**9. LOCATION, OWNERSHIP AND USE:** The Equipment shall, at all times, be the sole and exclusive property of Lessor. Lessee shall have no right or property interest therein, except for the right to use the Equipment in the normal operation of its business at the Location of Installation, or as otherwise provided herein. The Equipment is and shall remain personal property even if installed in or attached to real property. Lessor shall be permitted to display notice of its ownership on the Equipment by means of a suitable stencil, label or plaque affixed thereto.

Lessee shall keep the Equipment at all times free and clear from all claims, levies, encumbrances and process. Lessee shall give Lessor immediate notice of any such attachment or other judicial process affecting any of the Equipment. Without Lessor's written permission, Lessee shall not attempt to or actually: (i) pledge, lend, create a security interest in, sublet, exchange, trade, assign, swap, use for an allowance or credit or otherwise; (ii) allow another to use; (iii) part with possession; (iv) dispose of; or (v) remove from the Location of Installation, any item of Equipment. If any item of Equipment is exchanged, assigned, traded, swapped, used for an allowance or credit or otherwise to acquire new or different equipment (the "New Equipment") without Lessor's prior written consent, then all of the New Equipment shall become Equipment owned by Lessor subject to this Lease Agreement and the applicable Lease Schedule.

Any feature(s) installed on the Equipment at the time of delivery that are not specified on the Lease Schedule(s) are and shall remain the sole property of the Lessor.

Lessee shall cause the Equipment to be operated in accordance with the applicable vendor's or manufacturer's manual of instructions by competent and qualified personnel.

**10. FINANCING STATEMENT:** Lessor is hereby authorized by Lessee to cause this Lease Agreement or other instruments, including Uniform Commercial Code Financing Statements, to be filed or recorded for the purposes of showing Lessor's interest in the Equipment. Lessee agrees to execute any such instruments as Lessor may request from time to time.

**11. ALTERATIONS AND ATTACHMENTS:** Upon prior written notice to Lessor, Lessee may, at its own expense, make minor alterations in or add attachments to the Equipment, provided such alterations and attachments shall not interfere with the normal operation of the Equipment and do not otherwise involve the pledge, assignment, exchange, trade or substitution of the Equipment or any component or part thereof. All such alterations and attachments to the Equipment shall become part of the Equipment leased to Lessee and owned by Lessor. If, in Lessor's sole determination, the alteration or attachment reduces the value of the Equipment or interferes with the normal and satisfactory operation or maintenance of any of the Equipment, or creates a safety hazard, Lessee shall, upon notice from Lessor to that effect, promptly remove the alteration or attachment at Lessee's expense and restore the Equipment to the condition the Equipment was in just prior to the alteration or attachment.

**12. LOSS AND DAMAGE:** Lessee shall assume and bear the risk of loss, theft and damage (including any governmental requisition, condemnation or confiscation) to the Equipment and all component parts thereof from any and every cause whatsoever, whether or not covered by insurance. No loss or damage to the Equipment or any component part thereof shall impair any obligation of Lessee under this Lease Agreement, which shall continue in full force and effect except as hereinafter expressly provided. Lessee shall repair or cause to be repaired all damage to the Equipment. In the event that all or part of the Equipment shall, as a result of any cause whatsoever, become lost, stolen, destroyed, depleted or otherwise rendered irreparably unusable, damaged or consumed, which shall include Equipment that would be rendered unusable by the act of deinstalling for return to Lessor (e.g. leasehold improvements of real estate etc.) (collectively, the "Loss") then Lessee shall, within ten (10) days after the Loss, fully inform Lessor in writing of such a Loss and shall pay to Lessor the following amounts: (i) the Monthly Lease Charges (and other amounts) then due and owing under this Lease Agreement, plus (ii) one-hundred (100%) percent of the original cost of the Equipment subject to the Loss if the loss occurs in either the installation period or during the first nine months of the Initial Term, and, thereafter, the original cost of the Equipment amortized by the subsequent Monthly Lease Charges received by Lessor during the Initial Term using an amortization rate of eight hundred and ninety (890) basis points over the interest rate of the three (3) year United States Treasury Note as reported by the Federal Reserve on the Commencement Date (collectively, the sum of (i) plus (ii) shall be the "Casualty Loss Value"). If the Loss occurs after the Initial Term, (ii) above shall be the remaining unamortized balance as of the end of the Initial Term without further amortization (the "Terminal Casualty Loss Value"). Notwithstanding the foregoing, if Lessee has provided notice to terminate the applicable Lease Schedule prior to informing Lessor in writing of a Loss and such Loss is not covered by insurance proceeds pursuant to Section 13 hereof, then Lessee shall pay two (2) times the Casualty Loss Value on the Equipment subject to such Loss. Upon receipt by Lessor of the Casualty Loss Value: (i) the applicable Equipment shall be removed from the Lease Schedule; and (ii) Lessee's obligation to pay Lease Charges associated with the applicable Equipment shall cease. Lessor may request, and Lessee shall complete, an affidavit(s) that swears out the facts supporting the Loss of any item of Equipment.

**13. INSURANCE:** Until the Equipment is returned to Lessor or as otherwise herein provided, whether or not this Lease Agreement has terminated as to the Equipment, Lessee, at its expense, shall maintain: (i) property and casualty insurance insuring the Equipment for its Casualty Loss Value naming Lessor or its assigns as sole loss payee; and (ii) comprehensive public liability and third-party property insurance naming Lessor and its assigns as additional loss payees. The

insurance shall cover the interest of both the Lessor and Lessee in the Equipment, or as the case may be, shall protect both the Lessor and Lessee in respect to all risks arising out of the condition, delivery, installation, maintenance, use or operation of the Equipment. All such insurance shall provide for thirty (30) days prior written notice to Lessor of cancellation, restriction, or reduction of coverage. Lessee hereby irrevocably appoints Lessor as Lessee's attorney-in-fact to make claim for, receive payment of and execute and endorse all documents, checks or drafts for loss or damage or return premium under any insurance policy issued on the Equipment. Prior to installation of the Equipment, all policies or certificates of insurance shall be delivered to Lessor by Lessee. Lessee agrees to keep the Equipment insured with an insurance company which is at least "A" rated by A.M. Best. The proceeds of any loss or damage insurance shall be payable to Lessor, but Lessor shall remit all such insurance proceeds to Lessee at such time as Lessee either (i) provides Lessor satisfactory proof that the damage has been repaired and the Equipment has been restored to good working order and condition or (ii) pays to Lessor the Casualty Loss Value. It is understood and agreed that any payments made by Lessee or its insurance carrier for loss or damage of any kind whatsoever to the Equipment are not made as accelerated rental payments or adjustments of rental, but are made solely as indemnity to Lessor for loss or damage of its Equipment.

**14. ENFORCEMENT OF WARRANTIES:** Upon receipt of a written request from Lessee, Lessor shall, so long as this Lease Agreement is in force, take all reasonable action requested by Lessee to enforce the Equipment manufacturer's warranties, expressed or implied, issued on or applicable to the Equipment, which are enforceable by Lessor in its own name. Lessor shall obtain for Lessee all service furnished by manufacturer in connection therewith; provided, however, that Lessor shall not be required to commence any suit or action or resort to litigation to enforce any such warranty unless Lessee shall first pay to Lessor in advance all expenses in connection therewith, including attorney's' fees.

If any such warranty shall be enforceable by Lessee in its own name, Lessee shall, upon receipt of written request from Lessor, so long as this Lease Agreement is in force, take all reasonable action requested by Lessor to enforce any such warranty, which is enforceable by Lessee in its own name; provided, however, that Lessee shall not be obligated to commence any suit or action or resort to litigation to enforce any such warranty unless Lessor shall pay all expenses in connection therewith.

**15. WARRANTIES, DISCLAIMERS AND INDEMNITY:** THE LESSOR DOES NOT MAKE ANY WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING THE WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. LESSEE ACKNOWLEDGES THAT IT IS NOT RELYING ON LESSOR'S SKILL OR JUDGEMENT TO SELECT OR FURNISH GOODS SUITABLE FOR ANY PARTICULAR PURPOSE AND THAT THERE ARE NO WARRANTIES CONTAINED IN THIS LEASE AGREEMENT. LESSEE ACKNOWLEDGES AND AGREES THAT LESSOR HAS NOT MADE ANY STATEMENT, REPRESENTATION OR WARRANTY RELATIVE TO THE ACCOUNTING OR TAX ENTRIES, TREATMENT, BENEFIT, USE OR CLASSIFICATION OF THE LEASE AGREEMENT OR ASSOCIATED LEASE SCHEDULES. LESSEE ACKNOWLEDGES THAT IT AND/OR ITS INDEPENDENT ACCOUNTANTS ARE SOLELY RESPONSIBLE FOR (i) ANY AND ALL OF LESSEE'S ACCOUNTING AND TAX ENTRIES ASSOCIATED WITH THE LEASE AGREEMENT AND/OR THE LEASE SCHEDULES AND (ii) THE ACCOUNTING AND TAX TREATMENT, BENEFITS, USES AND CLASSIFICATION OF THE LEASE AGREEMENT OR ANY LEASE SCHEDULE. LESSOR SHALL NOT BE LIABLE FOR DAMAGES, INCLUDING SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE PERFORMANCE OF THE EQUIPMENT OR ITS USE BY LESSEE, AND SHALL NOT BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR

CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH LESSOR'S FAILURE TO PERFORM ITS OBLIGATION HEREUNDER. THIS LEASE AGREEMENT IS A "FINANCE LEASE" AS THAT TERM IS DEFINED AND USED IN ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE. NO RIGHTS OR REMEDIES REFERRED TO IN ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE WILL BE CONFERRED ON LESSEE.

Lessee agrees that Lessor shall not be liable to Lessee for, and Lessee shall indemnify, defend and hold Lessor harmless with respect to, any claim from a third party for any liability, claim, loss, damage or expense of any kind or nature, whether based upon a theory of strict liability or otherwise, caused, directly or indirectly, by: (i) the inadequacy of any item of Equipment, including software, for any purpose; (ii) any deficiency or any latent or other defects in any Equipment, including software, whether or not detectable by Lessee; (iii) the selection, manufacture, rejection, ownership, lease, possession, maintenance, operation, use or performance of any item of Equipment, including software; (iv) any interruption or loss of service, use or performance of any item of Equipment, including software; (v) patent, trademark or copyright infringement; or (vi) any loss of business or other special, incidental or consequential damages whether or not resulting from any of the foregoing. Lessee's duty to defend and indemnify Lessor shall survive the expiration, termination, cancellation or assignment of this Lease Agreement or a Lease Schedule and shall be binding upon Lessee's successors and permitted assigns.

**16. EVENT OF DEFAULT:** The occurrence of any of the following events shall constitute an Event of Default under this Lease Agreement and/or any Lease Schedule:

(1) the nonpayment by Lessee of any Lease Charges when due, or the nonpayment by Lessee of any other sum required hereunder to be paid by Lessee which non-payment continues for a period of ten (10) days from the date when due;

(2) the failure of Lessee to perform any other term, covenant or condition of this Lease Agreement, any Lease Schedule or any other document, agreement or instrument executed pursuant hereto or in connection herewith, which is not cured within ten (10) days;

(3) Lessee attempts to or does remove, transfer, sell, swap, assign, sublease, trade, exchange, encumber, receive an allowance or credit for, or part with possession of, any item of Equipment;

(4) Lessee or any guarantor of this Lease Agreement ceases doing business as a going concern, is insolvent, makes an assignment for the benefit of creditors, fails to pay its debts as they become due, offers a settlement to creditors or calls a meeting of creditors for any such purpose, files a voluntary petition in bankruptcy, is subject to an involuntary petition in bankruptcy, is adjudicated bankrupt or insolvent, files or has filed against it a petition seeking any reorganization, arrangement or composition, under any present or future statute, law or regulation;

(5) without Lessor's express prior written consent, (i) Lessee or any guarantor of this Lease Agreement sells, conveys, leases, exchanges or transfers all or substantially all of its assets, (ii) Lessee or any guarantor of this Lease Agreement merges, consolidates, liquidates, dissolves or combines its assets with any other entity, or (iii) if Lessee or any guarantor of this Lease Agreement is a corporation, partnership, limited liability company or other entity, more than 50% of the outstanding equity interests of Lessee or such guarantor are owned directly or indirectly at any time during the Term of this Lease Agreement by a person or group of persons other than the person(s) who held all of the outstanding equity interests on the date of this Lease Agreement;

(6) any representations or warranties made at any time by Lessee or any guarantor in this Lease Agreement or in any agreement, statement, certificate, financial or credit information provided in connection herewith are false or misleading when made;

(7) Lessee or any guarantor of this Lease Agreement defaults under or otherwise has accelerated any material obligation, credit

agreement, loan agreement, conditional sales contract, lease, indenture or debenture; or Lessee or any guarantor of this Lease Agreement defaults under any other agreement now existing or hereafter made with Lessor, including an Equipment Purchase Agreement; or

(8) the breach or repudiation by any party thereto of any guaranty, subordination agreement or other agreement running in favor of Lessor obtained in connection with this Lease Agreement.

**17. REMEDIES:** Should any Event of Default occur and be continuing, Lessor may, in order to protect its interests and reasonably expected profits, with or without notice or demand upon Lessee, pursue and enforce, alternatively, successively and/or concurrently, any one or more of the following remedies:

(1) recover from Lessee all accrued and unpaid Lease Charges and other amounts due and owing on the date of the default;

(2) recover from Lessee from time to time all Lease Charges and other amounts as and when becoming due hereunder;

(3) accelerate, cause to become immediately due and recover the present value of all Lease Charges and other amounts due and/or likely to become due hereunder from the date of the default to the end of the lease term using a discount rate of three (3%) percent;

(4) cause to become immediately due and payable and recover from Lessee the Casualty Loss Value of the Equipment;

(5) terminate any or all of the Lessee's rights, but not its obligations, associated with the lease of Equipment under this Lease Agreement;

(6) retake (by Lessor, independent contractor, or by requiring Lessee to assemble and surrender the Equipment in accordance with the provisions of Section 7 hereinabove) possession of the Equipment without terminating the Lease Schedule or the Lease Agreement free from claims by Lessee which claims are hereby expressly waived by Lessee;

(7) require Lessee to deliver the Equipment to a location designated by Lessor;

(8) proceed by court action to enforce performance by Lessee of its obligations associated with any Lease Schedule and/or this Lease Agreement; and/or

(9) pursue any other remedy Lessor may otherwise have, at law, equity or under any statute, and recover damages and expenses (including attorneys' fees) incurred by Lessor by reason of the Event of Default.

Upon repossession of the Equipment, Lessor shall have the right to lease, sell or otherwise dispose of such Equipment in a commercially reasonable manner, with or without notice, at a public or private sale. Lessor's pursuit and enforcement of any one or more remedies shall not be deemed an election or waiver by Lessor of any other remedy. Lessor shall not be obligated to sell or re-lease the Equipment. Any sale or re-lease may be held at such place or places as are selected by Lessor, with or without having the Equipment present. Any such sale or re-lease, may be at wholesale or retail, in bulk or in parcels. Time and exactitude of each of the terms and conditions of this Lease Agreement are hereby declared to be of the essence. Lessor may accept past due payments in any amount without modifying the terms of this Lease Agreement and without waiving any rights of Lessor hereunder.

**18. COSTS AND ATTORNEYS' FEES:** In the event of any default, claim, proceeding, including a bankruptcy proceeding, arbitration, mediation, counter-claim, action (whether legal or equitable), appeal or otherwise, whether initiated by Lessor or Lessee (or a debtor-in-possession or bankruptcy trustee), which arises out of, under, or is related in any way to this Lease Agreement, any Lease Schedule, or any other document, agreement or instrument executed pursuant hereto or in connection herewith, or any governmental examination or investigation of Lessee, which requires Lessor's participation (individually and collectively, the "Claim"), Lessee, in addition to all other sums which Lessee may be called upon to pay under the provisions of this Lease Agreement, shall pay to Lessor, on demand, all costs, expenses and fees paid or payable in connection with

the Claim, including, but not limited to, attorneys' fees and out-of-pocket costs, including travel and related expenses incurred by Lessor or its attorneys.

**19. LESSOR'S PERFORMANCE OPTION:** Should Lessee fail to make any payment or to do any act as provided by this Lease Agreement, then Lessor shall have the right (but not the obligation), without notice to Lessee of its intention to do so and without releasing Lessee from any obligation hereunder to make or to do the same, to make advances to preserve the Equipment or Lessor's title thereto, and to pay, purchase, contest or compromise any insurance premium, encumbrance, charge, tax, lien or other sum which in the judgment of Lessor appears to affect the Equipment, and in exercising any such rights, Lessor may incur any liability and expend whatever amounts in its absolute discretion it may deem necessary therefor. All sums so incurred or expended by Lessor shall be due and payable by Lessee within ten (10) days of notice thereof.

**20. QUIET POSSESSION AND INSPECTION:** Lessor hereby covenants with Lessee that Lessee shall quietly possess the Equipment subject to and in accordance with the provisions hereof so long as Lessee is not in default hereunder; provided, however, that Lessor or its designated agent may, at any and all reasonable times during business hours, enter Lessee's premises for the purposes of inspecting the Equipment and the manner in which it is being used.

**21. ASSIGNMENTS:** This Lease Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Lessee, however, shall not assign this Lease Agreement or sublet any of the Equipment without first obtaining the express prior written consent of Lessor and its assigns, if any. If express prior written consent for either an assignment or change of control, defined as any of the events in section 16(5), is not provided by Lessor, Lessee shall purchase the Equipment from Lessor, in consideration for: (i) the greater of either the Equipment's retail in-place value or the Casualty Loss Value; plus (ii) all amounts then due and owing (including late fees and taxes); plus (iii) the present value of all future Monthly Lease Charges for the Initial Term or any renewal term thereafter discounted at a rate of three (3) percent. The sum of (i), (ii) and (iii) shall be payable at the close of the transaction requiring Lessor's consent, and the Lessor shall transfer the ownership of the Equipment to Lessee and terminate the Lease Agreement. Lessee acknowledges that the terms and conditions of this Lease Agreement have been fixed in anticipation of the possible assignment of Lessor's rights under this Lease Agreement and in and to the Equipment as collateral security to a third party ("Assignee" herein) which will rely upon and be entitled to the benefit of the provisions of this Lease Agreement. Lessee agrees to provide Lessor or its potential assigns with Lessee's most recent audited and its most current financial statements. Lessee agrees with Lessor and such Assignee to recognize in writing any such assignment within fifteen (15) days after receipt of written notice thereof and to pay thereafter all sums due to Lessor hereunder directly to such Assignee if directed by Lessor, notwithstanding any defense, set-off or counterclaim whatsoever (whether arising from a breach of this Lease Agreement or not) that Lessee may from time to time have against Lessor. Upon such assignment, the Lessor shall remain obligated to perform any obligations it may have under this Lease Agreement and the Assignee shall (unless otherwise expressly agreed to in writing by the Assignee) have no obligation to perform such obligations. Any such assignment shall be subject to Lessee's rights to use and possess the Equipment so long as Lessee is not in default hereunder.

**22. SURVIVAL OF OBLIGATIONS:** All covenants, agreements, representations, and warranties contained in this Lease Agreement, any Lease Schedule, or in any document attached thereto, shall be for the benefit of Lessor and Lessee and their successors, any assignee or secured party. Further, all covenants, agreements, representations, and warranties contained in this Lease Agreement, any Lease Schedule, or in any document attached thereto, shall survive the execution and

v.010616

delivery of this Lease Agreement and the expiration or other termination of this Lease Agreement.

**23.  CORPORATE AUTHORITY:**  The parties hereto covenant and warrant that the persons executing this Lease Agreement and each Lease Schedule on their behalf have been duly authorized to do so, and this Lease Agreement and any Lease Schedule constitute a valid and binding obligation of the parties hereto.  The Lessee will, if requested by Lessor, provide to Lessor, Certificates of Authority naming the officers of the Lessee who have the authority to execute this Lease Agreement and any Lease Schedules attached thereto.

**24.  LANDLORDS' AND MORTGAGEES' WAIVER:**  If requested, Lessee shall furnish waivers, in form and substance satisfactory to Lessor, from all landlords and mortgagees of any premises upon which any Equipment is located.

**25.  MISCELLANEOUS:**  This Lease Agreement, the Lease Schedule(s), attached riders and any documents or instruments issued or executed pursuant hereto will have been made, executed and delivered in, and will be governed by the internal laws (as opposed to conflicts of law provisions) and decisions of, the State of Minnesota.  Lessee and Lessor consent to jurisdiction of any local, state or federal court located within Minnesota.  Venue will be in Minnesota and Lessee hereby waives local venue and any objection relating to Minnesota being an improper venue to conduct any proceeding relating to this Lease Agreement.  At Lessor's sole election and determination, Lessor may select an alternative forum, including arbitration or mediation, to adjudicate any dispute arising out of this Lease Agreement.  THE PARTIES HERETO, AFTER CONSULTING (OR HAVING HAD AN OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATING TO THIS LEASE, INCLUDING ANY LITIGATION REGARDING THE ENFORCEMENT OF THIS LEASE OR ANY RELATED AGREEMENT.

This Lease Agreement was jointly drafted by the parties, and the parties hereby agree that neither should be favored in the construction, interpretation or application of any provision or any ambiguity.  There are no unwritten or oral agreements between the parties.  This Lease Agreement and associated Lease Schedule(s) constitute the entire understanding and agreement between Lessor and Lessee with respect to the lease of the Equipment superseding all prior agreements, understandings, negotiations, discussions, proposals, representations, promises, commitments and offers between the parties, whether oral or written.  No provision of this Lease Agreement or any Lease Schedule shall be deemed waived, amended, discharged or modified orally or by custom, usage or course of conduct unless such waiver, amendment or modification is in writing and signed by an officer of each of the parties hereto.  If any one or more of the provisions of this Lease Agreement or any Lease Schedule is for any reason held invalid, illegal or unenforceable, the remaining provisions of this Lease Agreement and any such Lease Schedule will be unimpaired, and the invalid, illegal or unenforceable

provisions shall be replaced by a mutually acceptable valid, legal and enforceable provision that is closest to the original intention of the parties.  Lessee agrees that neither the manufacturer, nor the supplier, nor any of their salespersons, employees or agents are agents of Lessor.

Any notice provided for herein shall be in writing and sent by certified or registered mail to the parties at the addresses stated on page 1 of this Lease Agreement.  This Lease Agreement shall not become effective until delivered to Lessor at its offices at Minnetonka, Minnesota and executed by Lessor.  If this Lease Agreement shall be executed by Lessor prior to being executed by Lessee, it shall become void at Lessor's option five (5) days after the date of Lessor's execution hereof, unless Lessor shall have received by such date a copy hereof executed by a duly authorized representative of Lessee.

This Lease Agreement is made subject to the terms and conditions included herein and Lessee's acceptance is effective only to the extent that such terms and conditions are consistent with the terms and conditions herein.  Any acceptance which contains terms and conditions which are in addition to or inconsistent with the terms and conditions herein will be a counter-offer and will not be binding unless agreed to in writing by Lessor.

The terms used in this Lease Agreement, unless otherwise defined, shall have the meanings ascribed to them in the Lease Schedule(s).

**26.  REPOSSESSION:**  LESSEE ACKNOWLEDGES THAT, PURSUANT TO SECTION 17 HEREOF, LESSOR HAS BEEN GIVEN THE RIGHT TO REPOSSESS THE EQUIPMENT SHOULD LESSEE BECOME IN DEFAULT OF ITS OBLIGATIONS HEREUNDER.  LESSEE HEREBY WAIVES THE RIGHT, IF ANY, TO REQUIRE LESSOR TO GIVE LESSEE NOTICE AND A JUDICIAL HEARING PRIOR TO EXERCISING SUCH RIGHT OF REPOSSESSION.

**27.  NET LEASE:**  This Lease Agreement is a net lease and Lessee's obligations to pay all Lease Charges and other amounts payable hereunder shall be absolute and unconditional and, except as expressly provided herein, shall not be subject to any: (i) delay, abatement, reduction, defense, counterclaim, set-off, or recoupment; (ii) discontinuance or termination of any license; (iii) Equipment failure, defect or deficiency; (iv) damage to or destruction of the Equipment; or (v) dissatisfaction with the Equipment or otherwise, including any present or future claim against Lessor or the manufacturer, supplier, reseller or vendor of the Equipment.  To the extent that the Equipment includes intangible (or intellectual) property, Lessee understands and agrees that: (i) Lessor is not a party to and does not have any responsibility under any software license and/or other agreement with respect to any software; and (ii) Lessee will be responsible to pay all of the Lease Charges and perform all its other obligations under this Lease Agreement despite any defect, deficiency, failure, termination, dissatisfaction, damage or destruction of any software or software license.  Except as expressly provided herein, this Lease Agreement shall not terminate for any reason, including any defect in the Equipment or Lessor's title thereto or any destruction or loss of use of any item of Equipment.

**28.  HEADINGS:**  Section headings herein are used for convenience only and shall not otherwise affect the provisions of this Lease Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Lease Agreement to be signed by their respective duly authorized representative.

**Every Term is Agreed to and Accepted:**
**FARNAM STREET FINANCIAL, INC.**

By: *Steven Morgan*

Print Name: Steve Morgan

Title: President

Date: Sep 15, 2022

**Every Term is Agreed to and Accepted:**
**MAYA MD INC.**

By: *Robert Bledsoe*
~~Robert Bledsoe (Sep 15, 2022 13:15 CDT)~~

Print Name: Robert Bledsoe

Title: CFO

Date: Sep 15, 2022

## LEASE SCHEDULE NO. 001

This Lease Schedule is issued pursuant to the Lease Agreement Number MA090822 dated September 8, 2022. The terms of the Lease Agreement and serial numbers contained on Certificate(s) of Acceptance are a part hereof and are incorporated by reference herein.

**LESSOR**
Farnam Street Financial, Inc.
5850 Opus Parkway, Suite 240
Minnetonka, MN  55343

**LESSEE**
Maya MD Inc.
10330 Apache Blue Avenue
Las Vegas, NV 89135-1477

**SUPPLIER OF EQUIPMENT**
Various

**LOCATION OF EQUIPMENT**
Various

Initial Term of Lease from Commencement Date: 30 Months
Monthly Lease Charge:  $27,936.49
Anticipated Delivery and Installation: September 2022 – February 2023
Projected Commencement Date: March 1, 2023
Security Deposit: Upon Lessee's execution of this Lease Schedule, Lessee shall deliver a security deposit in the amount of $55,872.98.   Provided that there has been no event of default and Lessee has returned all of the Equipment under this Lease Schedule per the terms of the Lease Agreement, this security deposit will be returned to Lessee.

<u>**EQUIPMENT**</u>

| **MANUFACTURER** | **QTY** | **MACHINE/MODEL** | **EQUIPMENT DESCRIPTION (including features)** |
|---|---|---|---|
| Tenovi | | | Various |

The cost of all the Equipment on this Lease Schedule shall total $800,000.00. The Monthly Lease Charge listed above is calculated based on the agreement that this cost will be comprised of $800,000.00 of hardware at a lease rate factor of 0.034921 per $1.00 and $0.00 of non-hardware costs at a lease rate factor of 0.039683 per $1.00. Should the total cost of the Equipment exceed that indicated above, Lessor and Lessee agree that the Monthly Lease Charge above will be increased to reflect this additional cost at the Installation Date of the additional Equipment. If the total cost of non-hardware exceeds that indicated above, the hardware portion of the commitment above will be increased dollar for dollar by the amount of the additional non-hardware. This Lease Schedule No. 001 will Commence on the first of the month following the later of (i) the date the Lessee has satisfied its commitment to install all of the Equipment, as described above; or (ii) Lessor's receipt of Lessee's executed commencing Lease Schedule; however, Lessor may, at its sole discretion, close and Commence this Lease Schedule at an earlier date. A revised Lease Schedule No. 001R to replace this Lease Schedule No. 001 shall be executed by both parties to reflect the actual Equipment cost accepted and the commensurate Monthly Lease Charge, including any adjustments required under the Monthly Lease Charge Adjustment Rider. The Monthly Lease Charge will be prorated and charged as interim rent between the Installation Date of each item of equipment, as Lessee indicates on the Certificate(s) of Acceptance, and the Commencement Date. Interim rent due prior to the Commencement Date shall not reduce or offset Lessee's post-Commencement Monthly Lease Charge obligations hereunder.

**Every Term is Agreed to and Accepted:**
**FARNAM STREET FINANCIAL, INC.**
**"LESSOR"**

By: *Steven Morgan*

Print
Name: Steve Morgan

Title: President

Date: Sep 15, 2022

**Every Term is Agreed to and Accepted:**
**MAYA MD INC.**
**"LESSEE"**

By: *Robert Bledsoe*
Robert Bledsoe (Sep 15, 2022 13:10 CDT)

Print
Name: Robert Bledsoe

Title: CFO

Date: Sep 15, 2022

| | |
|---|---|
| **Rider Number:** | **001** |
| **Lease Agreement Number:** | **MA090822** |
| **Lease Schedule Number(s):** | **ALL** |
| **Lessee Name:** | **MAYA MD INC.** |
| **Lease Agreement Dated:** | **SEPTEMBER 8, 2022** |

### MONTHLY LEASE CHARGE ADJUSTMENT

This Lease Schedule is intended to be a fixed rate lease during the installation period and from the Commencement Date to the end of the term. The three-year treasury rate is an integral part of calculating the Monthly Lease Charge for this Lease Schedule. The Lessor and Lessee agree that the Monthly Lease Charge shall be fixed upon execution of this Lease and that should the three-year treasury note increase between the execution of this Lease Schedule and the Commencement Date, the Monthly Lease Charge will be adjusted on the Commencement Date to reflect such increase and will then be fixed for the term of this Lease Schedule.

| | |
|---|---|
| **Every Term is Agreed to and Accepted:**<br>**FARNAM STREET FINANCIAL, INC.**<br>**"LESSOR"** | **Every Term is Agreed to and Accepted:**<br>**MAYA MD INC.**<br>**"LESSEE"** |
| **By:** *Steven Morgan* | **By:** *Robert Bledsoe*<br><sub>Robert Bledsoe (Sep 15, 2022 12:12 CDT)</sub> |
| **Print Name:** Steve Morgan | **Print Name:** Robert Bledsoe |
| **Title:** President | **Title:** CFO |
| **Date:** Sep 15, 2022 | **Date:** Sep 15, 2022 |

| | |
|---|---|
| **Rider Number:** | **002** |
| **Lease Agreement Number:** | **MA090822** |
| **Lease Schedule Number:** | **ALL** |
| **Lessee Name:** | **MAYA MD INC.** |
| **Lease Agreement Dated:** | **SEPTEMBER 8, 2022** |

### RIGHT OF FIRST REFUSAL

Lessee shall notify Lessor ("Third Party Lease Offer Notice") within five (5) business days of receiving any bona fide offer from a third party to lease equipment to Lessee, which offer Lessee intends to accept (a "Third-Party Offer"). Prior to accepting such offer, Lessee shall make an offer (the "Right of First Refusal") to lease the equipment which is the subject of the Third-Party Offer (the "Offered Lease") from Lessor upon the same terms and conditions of the Third Party Offer and in accordance with the terms and conditions set forth below.

**(a) Notice.**   The Third-Party Lease Offer Notice shall state the economic terms (including, but not limited to, equipment cost, monthly rental amount, purchase options), the terms and conditions of the Third Party Offer and the name of the third-party offeror, together with a copy of all writings between the third-party offeror and Lessee necessary to establish the terms of the Third-Party Offer. Upon receipt of the Third-Party Lease Offer Notice, Lessor shall have the right but not the obligation to enter into the Offered Lease with Lessee upon the terms and conditions of the Third-Party Offer, subject to subparagraph (b) below.

**(b) Exercise.**   The Right of First Refusal shall first be exercisable by Lessor with respect to all, but not less than all, of the Offered Equipment by delivery of written notice of exercise to Lessee within ten (10) days after receipt of the Third-Party Lease Offer Notice. If Lessor does not exercise its Right of First Refusal within the time period as set forth above, the Right of First Refusal with respect to the Third-Party Lease Offer Notice under consideration shall be deemed to have expired.

**(c) Expiration.**   The Right of First Refusal shall terminate three (3) years from later of: (i) the date of the Lease Agreement, or (ii) the termination date of the last Lease Schedule.

**(d) Default.**   Should Lessee accept a Third-Party Offer without either providing Lessor with a Third-Party Lease Offer Notice or, when notice has been provided, allowing Lessor to enter into the Offered Lease, Lessee will pay to Lessor a fee equal to ten (10) percent of the equipment cost subject to the Offered Lease within thirty (30) days of executing the Offered Lease. Notwithstanding any provision to the contrary in the Lease Agreement or applicable Lease Schedule, any security deposits paid under Lease Schedules covered hereunder shall be held by Lessor until the expiration of this rider.

| | |
|---|---|
| **Every Term is Agreed to and Accepted:**<br>**FARNAM STREET FINANCIAL, INC.**<br>**"LESSOR"** | **Every Term is Agreed to and Accepted:**<br>**MAYA MD INC.**<br>**"LESSEE"** |
| By: _Steven Morgan_ | By: _Robert Bledsoe_<br><span style="font-size:smaller">Robert Bledsoe (Sep 15, 2022 12:19 CDT)</span> |
| **Print Name:** Steve Morgan | **Print Name:** Robert Bledsoe |
| **Title:** President | **Title:** CFO |
| **Date:** Sep 15, 2022 | **Date:** Sep 15, 2022 |

| | |
|---|---|
| **Rider Number:** | **003** |
| **Lease Agreement Number:** | **MA090822** |
| **Lease Schedule Number(s):** | **001** |
| **Lessee Name:** | **MAYA MD INC.** |
| **Lease Agreement Dated:** | **SEPTEMBER 8, 2022** |

## PURCHASE OPTION

Lessee shall have the option to purchase the Equipment in its physical possession and on Lease Schedule No. 001 on the last day of the initial term, in whole and not in part, on an in-place basis and operating according to the manufacturer's specifications, for the then determined mutually-agreed purchase price (plus applicable taxes) provided that (i) an Event of Default has not occurred, (ii) Lessor has received all of the Lease Charges due under the Lease Schedule prior to Lessee exercising this option to purchase (including all late fees whether billed or unbilled), (iii) Lessor has received payment for all unpaid late fees and estimated property taxes, if any, and (iv) Lessor has received written notice of Lessee's election to exercise this purchase option not less than one hundred twenty (120) days prior to the last date of the initial term of this Lease Schedule. If a sale is not consummated, the notice provided to exercise this option shall be accepted as a notice to terminate and return all of the Equipment, and Lessee will return all of the Equipment on this Lease Schedule in accordance with the Lease Agreement. If Lessee does not return all of the Equipment, Lease Schedule No. 001 will continue in accordance with the Lease Agreement.

Lessee will receive title to the Equipment free and clear of all known liens only after Lessee has performed all of its obligations associated with the Lease Agreement and Lessor has been paid all sums due or becoming due under both this purchase option and the Lease Agreement, including, whether billed or not, all lease charges, taxes, and late fees. Lessor shall retain as income all monies received in association with the Lease Schedule including all rent, taxes, security deposits and other monthly lease charges and Lessee hereby waives any right to offset these monies against the costs associated with the exercise of this purchase option. Any sales or use tax due and not paid on these monies shall be added to the purchase price above.

| **Every Term is Agreed to and Accepted:** | **Every Term is Agreed to and Accepted:** |
|---|---|
| **FARNAM STREET FINANCIAL, INC.** | **MAYA MD INC.** |
| **"LESSOR"** | **"LESSEE"** |
| By: _Steven Morgan_ | By: _Robert Bledsoe_ |
| | Robert Bledsoe (Sep 15, 2022 13:15 CDT) |
| **Print Name:** Steve Morgan | **Print Name:** Robert Bledsoe |
| **Title:** President | **Title:** CFO |
| **Date:** Sep 15, 2022 | **Date:** Sep 15, 2022 |

## ADDENDUM NO. 1

This transaction is a true lease and is not intended by the parties as a secured transaction. Filing is only intended to make the true lease a matter of public record. Farnam Street Financial, Inc. is the owner of all the equipment contained on this filing and any and all other equipment now or hereafter the subject of any lease agreement or lease schedule by and between the parties and all accessories, attachments, additions, and any substitutions and/or replacement of the equipment contained on this filing or any lease agreement or lease schedule between the parties. The lessee has no rights, express or implied, to sell, exchange, encumber, or otherwise dispose of any equipment contained on this filing or any lease agreement or lease schedule by and between the parties. The parties agree that this financing statement covers any and all equipment now or hereafter the subject of any lease agreement or lease schedule by and between the parties, including, but not limited to equipment contained on or subject to Lease Agreement Number MA090822 or any lease schedule executed pursuant thereto, together with all substitutions, replacements, accessions, process, rent, revenue, insurance, and proceeds related to the equipment contained on this filing or any lease agreement or lease schedule by and between the parties.

Every Term is Agreed to and Accepted:
**FARNAM STREET FINANCIAL, INC.**
"LESSOR"

By: *Steven Morgan*

Print
Name: Steve Morgan

Title: President

Date: Sep 15, 2022

Every Term is Agreed to and Accepted:
**MAYA MD INC.**
"LESSEE"

By: *Robert Bledsoe*
Robert Bledsoe (Sep 15, 2022 15:15 CDT)

Print
Name: Robert Bledsoe

Title: CFO

Date: Sep 15, 2022

# EXHIBIT B

# Invoice 613978



June 2, 2025
Page  1 / 3

Contract #: MA090822-001
Total Due: $30,010.89
Due Date: July 1, 2025

**Maya MD Inc.**
Vipindas Chengat
10330 Apache Blue Ave
Las Vegas, NV 89135-1477
USA

**Farnam Street Financial, Inc.**
5850 Opus Parkway, Suite 240
Minnetonka, MN  55343

https://www.farnamstreet.net
Phone:  (952) 908-0850
accounting@farnamstreet.net

| Description | Amount (USD) |
|---|---:|
| Equipment Location: 8400 W Sunset Rd, Las Vegas, NV, 89113-2283 | |
| Interim Rent Due on CofA No. 001 from 7/1/2025 to 7/31/2025 | 503.11 |
| Sales/Use Tax | 42.14 |
| Interim Rent Due on CofA No. 002 from 7/1/2025 to 7/31/2025 | 724.73 |
| Sales/Use Tax | 60.70 |
| Interim Rent Due on CofA No. 003 from 7/1/2025 to 7/31/2025 | 76.58 |
| Sales/Use Tax | 6.41 |
| Interim Rent Due on CofA No. 004 from 7/1/2025 to 7/31/2025 | 132.93 |
| Sales/Use Tax | 11.13 |
| Interim Rent Due on CofA No. 005 from 7/1/2025 to 7/31/2025 | 794.18 |
| Sales/Use Tax | 66.51 |
| Interim Rent Due on CofA No. 006 from 7/1/2025 to 7/31/2025 | 14.06 |
| Sales/Use Tax | 1.18 |
| Interim Rent Due on CofA No. 007 from 7/1/2025 to 7/31/2025 | 177.62 |
| Sales/Use Tax | 14.88 |
| Interim Rent Due on CofA No. 008 from 7/1/2025 to 7/31/2025 | 80.91 |
| Sales/Use Tax | 6.78 |
| Interim Rent Due on CofA No. 009 from 7/1/2025 to 7/31/2025 | 678.73 |
| Sales/Use Tax | 56.84 |
| Interim Rent Due on CofA No. 010 from 7/1/2025 to 7/31/2025 | 956.86 |
| Sales/Use Tax | 80.14 |
| Interim Rent Due on CofA No. 011 from 7/1/2025 to 7/31/2025 | 67.62 |
| Sales/Use Tax | 5.66 |
| Interim Rent Due on CofA No. 012 from 7/1/2025 to 7/31/2025 | 102.25 |
| Sales/Use Tax | 8.56 |
| Interim Rent Due on CofA No. 013 from 7/1/2025 to 7/31/2025 | 435.50 |
| Sales/Use Tax | 36.47 |
| Interim Rent Due on CofA No. 014 from 7/1/2025 to 7/31/2025 | 819.37 |
| Sales/Use Tax | 68.62 |
| Interim Rent Due on CofA No. 015 from 7/1/2025 to 7/31/2025 | 1,277.14 |
| Sales/Use Tax | 106.96 |
| Interim Rent Due on CofA No. 016 from 7/1/2025 to 7/31/2025 | 819.33 |
| Sales/Use Tax | 68.62 |
| Interim Rent Due on CofA No. 017 from 7/1/2025 to 7/31/2025 | 515.73 |
| Sales/Use Tax | 43.19 |
| Interim Rent Due on CofA No. 018 from 7/1/2025 to 7/31/2025 | 830.46 |
| Sales/Use Tax | 69.55 |
| Interim Rent Due on CofA No. 019 from 7/1/2025 to 7/31/2025 | 104.13 |
| Sales/Use Tax | 8.72 |
| Interim Rent Due on CofA No. 020 from 7/1/2025 to 7/31/2025 | 96.81 |
| Sales/Use Tax | 8.11 |

**Invoice 613978**

June 2, 2025
Page 2 / 3

| | |
|---|---:|
| Interim Rent Due on CofA No. 021 from 7/1/2025 to 7/31/2025 | 429.47 |
| Sales/Use Tax | 35.97 |
| Interim Rent Due on CofA No. 022 from 7/1/2025 to 7/31/2025 | 402.80 |
| Sales/Use Tax | 33.73 |
| Interim Rent Due on CofA No. 023 from 7/1/2025 to 7/31/2025 | 194.99 |
| Sales/Use Tax | 16.33 |
| Interim Rent Due on CofA No. 024 from 7/1/2025 to 7/31/2025 | 765.48 |
| Sales/Use Tax | 64.11 |
| Interim Rent Due on CofA No. 025 from 7/1/2025 to 7/31/2025 | 348.55 |
| Sales/Use Tax | 29.19 |
| Interim Rent Due on CofA No. 026 from 7/1/2025 to 7/31/2025 | 180.12 |
| Sales/Use Tax | 15.09 |
| Interim Rent Due on CofA No. 027 from 7/1/2025 to 7/31/2025 | 159.92 |
| Sales/Use Tax | 13.39 |
| Interim Rent Due on CofA No. 028 from 7/1/2025 to 7/31/2025 | 71.46 |
| Sales/Use Tax | 5.98 |
| Interim Rent Due on CofA No. 029 from 7/1/2025 to 7/31/2025 | 322.26 |
| Sales/Use Tax | 26.99 |
| Interim Rent Due on CofA No. 030 from 7/1/2025 to 7/31/2025 | 281.16 |
| Sales/Use Tax | 23.55 |
| Interim Rent Due on CofA No. 031 from 7/1/2025 to 7/31/2025 | 91.56 |
| Sales/Use Tax | 7.67 |
| Interim Rent Due on CofA No. 032 from 7/1/2025 to 7/31/2025 | 68.71 |
| Sales/Use Tax | 5.75 |
| Interim Rent Due on CofA No. 033 from 7/1/2025 to 7/31/2025 | 96.81 |
| Sales/Use Tax | 8.11 |
| Interim Rent Due on CofA No. 034 from 7/1/2025 to 7/31/2025 | 76.03 |
| Sales/Use Tax | 6.37 |
| Interim Rent Due on CofA No. 035 from 7/1/2025 to 7/31/2025 | 140.81 |
| Sales/Use Tax | 11.79 |
| Interim Rent Due on CofA No. 036 from 7/1/2025 to 7/31/2025 | 60.43 |
| Sales/Use Tax | 5.06 |
| Interim Rent Due on CofA No. 037 from 7/1/2025 to 7/31/2025 | 178.33 |
| Sales/Use Tax | 14.94 |
| Interim Rent Due on CofA No. 038 from 7/1/2025 to 7/31/2025 | 377.39 |
| Sales/Use Tax | 31.61 |
| Interim Rent Due on CofA No. 039 from 7/1/2025 to 7/31/2025 | 166.25 |
| Sales/Use Tax | 13.92 |
| Interim Rent Due on CofA No. 040 from 7/1/2025 to 7/31/2025 | 462.35 |
| Sales/Use Tax | 38.72 |
| Interim Rent Due on CofA No. 041 from 7/1/2025 to 7/31/2025 | 249.02 |
| Sales/Use Tax | 20.86 |
| Interim Rent Due on CofA No. 042 from 7/1/2025 to 7/31/2025 | 148.23 |
| Sales/Use Tax | 12.41 |
| Interim Rent Due on CofA No. 043 from 7/1/2025 to 7/31/2025 | 791.08 |
| Sales/Use Tax | 66.25 |
| Interim Rent Due on CofA No. 044 from 7/1/2025 to 7/31/2025 | 257.96 |
| Sales/Use Tax | 21.60 |
| Interim Rent Due on CofA No. 045 from 7/1/2025 to 7/31/2025 | 14.28 |
| Sales/Use Tax | 1.20 |
| Interim Rent Due on CofA No. 046 from 7/1/2025 to 7/31/2025 | 610.97 |
| Sales/Use Tax | 51.17 |
| Interim Rent Due on CofA No. 047 from 7/1/2025 to 7/31/2025 | 130.14 |
| Sales/Use Tax | 10.90 |
| Interim Rent Due on CofA No. 048 from 7/1/2025 to 7/31/2025 | 1,861.95 |
| Sales/Use Tax | 155.94 |
| Interim Rent Due on CofA No. 049 from 7/1/2025 to 7/31/2025 | 63.17 |

**Invoice 613978**

June 2, 2025
Page 3 / 3

| | |
|---|---:|
| Sales/Use Tax | 5.29 |
| Interim Rent Due on CofA No. 050 from 7/1/2025 to 7/31/2025 | 75.05 |
| Sales/Use Tax | 6.29 |
| Interim Rent Due on CofA No. 051 from 7/1/2025 to 7/31/2025 | 1,492.88 |
| Sales/Use Tax | 125.03 |
| Interim Rent Due on CofA No. 052 from 7/1/2025 to 7/31/2025 | 119.51 |
| Sales/Use Tax | 10.01 |
| Interim Rent Due on CofA No. 053 from 7/1/2025 to 7/31/2025 | 1,611.15 |
| Sales/Use Tax | 134.93 |
| Interim Rent Due on CofA No. 054 from 7/1/2025 to 7/31/2025 | 146.04 |
| Sales/Use Tax | 12.23 |
| Interim Rent Due on CofA No. 055 from 7/1/2025 to 7/31/2025 | 3.06 |
| Sales/Use Tax | 0.26 |
| Interim Rent Due on CofA No. 056 from 7/1/2025 to 7/31/2025 | 482.49 |
| Sales/Use Tax | 40.41 |
| Interim Rent Due on CofA No. 057 from 7/1/2025 to 7/31/2025 | 1,059.69 |
| Sales/Use Tax | 88.75 |
| Interim Rent Due on CofA No. 058 from 7/1/2025 to 7/31/2025 | 64.85 |
| Sales/Use Tax | 5.43 |
| Interim Rent Due on CofA No. 059 from 7/1/2025 to 7/31/2025 | 3.18 |
| Sales/Use Tax | 0.27 |
| Interim Rent Due on CofA No. 060 from 7/1/2025 to 7/31/2025 | 521.63 |
| Sales/Use Tax | 43.69 |
| Interim Rent Due on CofA No. 061 from 7/1/2025 to 7/31/2025 | 93.47 |
| Sales/Use Tax | 7.83 |
| Interim Rent Due on CofA No. 062 from 7/1/2025 to 7/31/2025 | 39.64 |
| Sales/Use Tax | 3.32 |
| Interim Rent Due on CofA No. 063 from 7/1/2025 to 7/31/2025 | 1,446.65 |
| Sales/Use Tax | 121.16 |
| Interim Rent Due on CofA No. 064 from 7/1/2025 to 7/31/2025 | 15.64 |
| Sales/Use Tax | 1.31 |
| Interim Rent Due on CofA No. 065 from 7/1/2025 to 7/31/2025 | 1,168.84 |
| Sales/Use Tax | 97.89 |
| Interim Rent Due on CofA No. 066 from 7/1/2025 to 7/31/2025 | 1,138.20 |
| Sales/Use Tax | 95.32 |
| Location Subtotal:  $30,010.89 | |

| | |
|---|---:|
| **Grand Total Due $** | **30,010.89** |

# EXHIBIT C



**safford & baker**

Attorneys and Counselors

Ralph R. Safford
Donald H. Baker, Jr.

June 30, 2025

<u>Via Email Only to</u> pmcpartland@farnamstreet.net
Patrick McPartland
Farnam Street Financial, Inc.
5850 Opus Parkway, Ste. 240
Minnetonka, MN 55343

Re: Lease Agreement No. MA090822/Lessee MayaMD, Inc.

We are writing on behalf of MayaMD, Inc. ("Maya") regarding the above Lease Agreement. We have been furnished with a copy of a proposed Lease Schedule No. 001R which was sent to Maya for signature.

Maya is unable to sign the new Lease Schedule as presented, because it includes on the list of leased equipment several items which were installed 30 or more months ago. Maya has made lease payments on these items for 30 or more months and is entitled to terminate the lease as to them and intends to do so.

Maya is in the process of finalizing a list of these items and will furnish this list as soon as it is complete and available. Because this equipment is outdated, out of warranty and cannot be calibrated, it is of negligible value. The cost of packaging and returning this equipment exceeds its value. Maya requests that it not be required to return these items, but instead be authorized by Farnam to scrap the items.

Maya requests that Schedule No. 001R be revised to eliminate these items. In addition, Maya will be terminating the lease as to additional items of leased equipment as their 30 month term ends, and Maya requests permission to scrap these items as well, rather than return them.

In the interim, Maya will begin making $25,000 per month payments, with the understanding that once a revised Schedule is agreed to, an agreed monthly payment amount can be reset and if it is lower, appropriate credits can be made; if higher, a catch up payment can be made. Please advise the undersigned if these interim payment arrangements are acceptable to Farnam.

Sincerely,

Ralph R. Safford

Cc: Christian Habermann (via email)

5440 Corporate Drive, Suite 220 ● Troy, MI 48098 ● Telephone: (248) 646-9100 ● Facsimile: (248) 646-9102
A Professional Limited Liability Company

# EXHIBIT D



Phillip J. Ashfield
Direct Dial: 612-268-7072
pashfield@spencerfane.com

File No. 5518220.48

July 11, 2025

**VIA EMAIL**

Ralph R. Safford
Safford & Baker PLLC
5440 Corporate Drive, Ste. 220
Troy, MI  48098
rsafford@saffordbaker.com

Re:    **Farnam Street Financial, Inc. and MayaMD, Inc; Lease Agreement No. MN090822**

Dear Mr. Stafford:

This office serves as outside counsel to Farnam Street Financial, Inc. ("Farnam Street").  Please send all future correspondence regarding this matter to my attention.  I am in receipt of your letter dated June 20, 2025 to Farnam Street regarding Lease Agreement No. MA090822 ("Lease Agreement") and commencing Lease Schedule No. 001R ("Schedule 1R").

At the outset of this leasing relationship, MayaMD executed the Lease Agreement and Lease Schedule No. 001 ("Schedule1").  Pursuant to Schedule 1, MayaMD committed to leasing at least $800,000.00 worth of equipment from Farnam Street (the "Commitment").  Schedule 1 goes on to provide that the 30-month term commences on the later of (i) the date that MayaMD satisfies the Commitment, or (ii) Farnam Street's receipt of the executed commencing lease schedule (i.e., Schedule 1R) (the "Commencement Date").

MayaMD expressly agreed that it would pay "interim rent between the installation date of each item of equipment and the Commencement Date," and that any "interim rent due prior to the Commencement Date shall not reduce or offset [Farnam Street's] post-Commencement Monthly Lease Charge obligations."

To be clear, MayaMD controlled the timeline for acquiring equipment necessary to satisfy the Commitment.  It was not until June 3, 2025 that your client satisfied the Commitment when it executed Certificate of Acceptance No. 67 (enclosed).  Farnam Street did not control or impede the installation of equipment necessary to satisfy the leasing Commitment.  Once MayaMD satisfied the Commitment, Farnam Street immediately issued the commencing Schedule 1R for MayaMD's execution, which is consistent with the terms of the Lease Agreement and Schedule 1.

Farnam Street's position is supported by Minnesota case law.  *See Winthrop Res. Corp. v. Sabert Corp.*, 567 F. Supp. 2d 1084, 1091 (D. Minn. 2008) (enforcing commencement date of virtually identical equipment lease as "the first of the month following installation of *all* the Equipment") (emphasis in original); *All-Luminum Prods., Inc. v. Winthrop Res. Corp.*, 28 F. App'x 611, 612 (8th Cir. 2002) (fact that installation took place over more than a year did not change contract's explicit terms requiring payment of interim rent); *Winthrop Res. Corp. v. Diamond Home Servs., Inc.*, No. CIV. 00-622, 2001 WL 436118, at *2 (D. Minn. Apr. 24, 2001) (holding that lessee was not entitled to credit for payments of interim rent).

Ralph R. Safford
July 11, 2025
Page 2



Farnam Street remains committed to complying with the explicit and unambiguous terms of the Lease Agreement and Schedule 1 through execution of Schedule 1R and recognizing a Commencement Date of July 1, 2025 (the first of the month following satisfaction of the Commitment).

Please have your client execute and return Schedule 1R at its earliest convenience. If Farnam Street does not receive the executed Schedule 1R, it will continue to charge interim rent as expressly provided for in Schedule 1.

Sincerely,

Spencer Fane LLP

*s/ Phillip J. Ashfield*

Phillip J. Ashfield

PJA/re
Enclosure

# CERTIFICATE OF ACCEPTANCE

**Lease Agreement Number:**   **MA090822**
**Lease Schedule Number:**   **001**

I hereby certify:

1) That all of the items of Equipment on the attached Schedule A: (i)  have been received; (ii) are in good working order; (iii) have been tested and inspected; (iv) are satisfactory in all respects; and (v) are acceptable for use;

2) That all of the items of Equipment on the attached Schedule A were installed on the following date: See Attached Schedule "A"  (the "Installation Date");

3) That I am authorized to execute and deliver this Certificate of Acceptance;

4) That Farnam Street Financial, Inc. has performed all of its obligations; and

5) That Farnam Street Financial, Inc. is authorized to pay the supplier(s) for the equipment.

Lessor and Lessee agree that this Certificate of Acceptance and the attached Schedule A may be executed and delivered to the Lessor by the Lessee via facsimile, or transmitted electronically in either "Tagged Image Format Files" ("TIFF") or "Portable Document Format" ("PDF"). Upon such delivery, Lessee's facsimile, TIFF or PDF signature (as applicable) will be deemed to have the same force and effect as if Lessee's original signature had been delivered to the Lessor, and both the Certificate of Acceptance and the attached Schedule A shall be deemed an original instrument as between the Lessor and Lessee.

**Agreed to and Accepted:**

**MAYA MD INC.**

**"LESSEE"**

By: _____
Christian Habermann (Jun 3, 2025 11:38 EDT)

Print
Name:   **Christian  Habermann**

Title:   **COO/Co-Founder/Board Member**

Date: __06/03/2025__

CofA Number:   **MA090822-001-067**

Farnam Street
FINANCIAL

# SCHEDULE "A"

| MFG | PART# | QTY | DESCRIPTION | SERIAL NUMBER |
|---|---|---|---|---|
| TENOVI CO | | 1 | Upfront Charge for AAA Batteries - 4 Pack | |
| TENOVI CO | | 1 | Upfront Charge for AA Batteries - 4 Pack | |
| TENOVI CO | | 6 | Up Front Charge for Blood Pressure Meter - XL Cuff Only | |
| TENOVI CO | | 19 | Up Front Charge for Blood Pressure Meter - L Cuff Only | |
| TENOVI CO | | 9 | Up Front Charge for Blood Pressure Meter - S Cuff Only | |
| TENOVI CO | | 4 | Upfront Charge for Gateway Power Supply | |
| TENOVI CO | | 1 | Shipping Charge for AAA Batteries - 4 Pack | |
| TENOVI CO | | 1 | Shipping Charge for AA Batteries - 4 Pack | |
| TENOVI CO | | 6 | ShippingCharge for BPM - XL Cuff | |
| TENOVI CO | | 19 | Shipping Charge for BPM - L Cuff | |
| TENOVI CO | | 9 | Shipping Charge for BPM - S Cuff | |
| TENOVI CO | | 4 | Shipping Charge for Gateway Power Supply | |
| TENOVI CO | | 4 | Up Front Charge for Tenovi BPM | |
| TENOVI CO | | 1 | Up Front Charge for Tenovi Pulse Ox | |
| TENOVI CO | | 1 | Up Front Charge for Gateway | |
| TENOVI CO | | 4 | Shipping Charge for Tenovi BPM | |
| TENOVI CO | | 1 | Shipping Charge for Tenovi Pulse Ox | |
| TENOVI CO | | 1 | Shipping Charge for Gateway | |
| TENOVI CO | | 4 | Up Front Charge for Tenovi Scale | |
| TENOVI CO | | 1 | Up Front Charge for Tenovi BPM - L | |
| TENOVI CO | | 280 | Up Front Charge for Tenovi BPM | |
| TENOVI CO | | 13 | Up Front Charge for Tenovi Pulse Ox | |
| TENOVI CO | | 298 | Up Front Charge for Gateway | |
| TENOVI CO | | 1 | Up Front Charge for Omron Wrist BPM | |
| TENOVI CO | | 4 | Shipping Charge for Tenovi Scale | |
| TENOVI CO | | 1 | Shipping Charge for Tenovi BPM-L | |
| TENOVI CO | | 280 | Shipping Charge for Tenovi BPM | |
| TENOVI CO | | 13 | Shipping Charge for Tenovi Pulse Ox | |
| TENOVI CO | | 298 | Shipping Charge for Gateway | |
| TENOVI CO | | 1 | Shipping Charge for Omron Wrist BPM | |
| TENOVI CO | | 51 | Data Charges for Tenovi Scale | |
| TENOVI CO | | 3 | Data Charges for Tenovi BPM - XS | |
| TENOVI CO | | 10 | Data Charges for Tenovi BPM - XL | |

| MFG | PART# | QTY | DESCRIPTION | SERIAL NUMBER |
|-----|-------|-----|-------------|---------------|
| TENOVI CO | | 36 | Data Charges for Tenovi BPM - L | |
| TENOVI CO | | 1 | Data Charges for Tenovi Peak Flow Meter | |
| TENOVI CO | | 3891 | Data Charges for Tenovi BPM | |
| TENOVI CO | | 517 | Data Charges for Tenovi Pulse Ox | |
| TENOVI CO | | 4516 | Data Charges for Gateway | |
| TENOVI CO | | 15 | Data Charges for Tenovi Glucometer | |
| TENOVI CO | | 13 | Data Charges for Omron Wrist BPM | |
| TENOVI CO | | 2 | Data Charges for Tenovi BPM - S | |
| TENOVI CO | | 3 | Return Credit for Gateways | |
| TENOVI CO | | 3 | Return Credit for Tenovi BPM | |
| TENOVI CO | | 1 | Data Charges Removed | |

**Equipment Listed Above Located at:**  **8400 W Sunset Rd**
**Suite 300**
**Las Vegas, NV 89113-2283**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Date of Equipment Installation:** 06/03/2025

The Equipment Is Accepted:

**MAYA MD INC.**

**"LESSEE"**

By: _Christian Habermann (Jun 3, 2025 11:38 EDT)_

Print
Name  **Christian  Habermann**

Title:  **COO/Co-Founder/Board Member**

Date: 06/03/2025



Printed Jun 2, 2025, 1:46:03 PM

**Address:**  1 Cate Street, Suite 100,
Portsmouth, NH 03801

**Tel:**  (714) 418-5658

**Account Rep:**  Devon Gerwolls

**Account Rep Email:**  dgerwolls@tenovi.com

# Detailed Invoice

| | |
|---|---|
| **Bill To:** | **Invoice Number:**  7770-25044 |
| Attn: HWI Invoice - May, 2025 | **Invoice Date:**  04/30/2025 |
| MayaMD | **Billing Period (CLOSED):**  May, 2025 |
| 8400 W Sunset Rd, Ste 300 | **Total Amount Due:**  $ 25,056.50 |
| Las Vegas, NV 89113 | **Due Date:**  06/30/2025 |
| | **Amount Paid:**  $ 0.00 |

| Description | Qty | Unit Price | Amount |
|---|---|---|---|
| Up Front Charge for Tenovi Scale | 4 | $28.20 | $112.80 |
| Up Front Charge for Tenovi BPM - L | 1 | $28.20 | $28.20 |
| Up Front Charge for Tenovi BPM | 280 | $28.20 | $7,896.00 |
| Up Front Charge for Tenovi Pulse Ox | 13 | $28.20 | $366.60 |
| Up Front Charge for Gateway | 298 | $42.30 | $12,605.40 |
| Up Front Charge for Omron Wrist BPM | 1 | $75.00 | $75.00 |
| Device Charges Subtotal: $21,084.00 | | | |
| Shipping Charge for Tenovi Scale | 4 | $6.00 | $24.00 |
| Shipping Charge for Tenovi BPM - L | 1 | $4.00 | $4.00 |
| Shipping Charge for Tenovi BPM | 280 | $4.00 | $1,120.00 |



Printed Jun 2, 2025, 1:46:03 PM

| | | | |
|---|---|---|---|
| Shipping Charge for Tenovi Pulse Ox | 13 | $4.00 | $52.00 |
| Shipping Charge for Gateway | 298 | $10.00 | $2,980.00 |
| Shipping Charge for Omron Wrist BPM | 1 | $4.00 | $4.00 |
| Shipping Charges Subtotal: $4,184.00 | | | |
| Data Charges for Tenovi Scale | 51 | $0.50 | $25.50 |
| Data Charges for Tenovi BPM - XS | 3 | $0.50 | $1.50 |
| Data Charges for Tenovi BPM - XL | 10 | $0.50 | $5.00 |
| Data Charges for Tenovi BPM - L | 36 | $0.50 | $18.00 |
| Data Charges for Tenovi Peak Flow Meter | 1 | $0.50 | $0.50 |
| Data Charges for Tenovi BPM | 3891 | $0.50 | $1,945.50 |
| Data Charges for Tenovi Pulse Ox | 517 | $0.50 | $258.50 |
| Data Charges for Gateway | 4516 | $2.00 | $9,032.00 |
| Data Charges for Tenovi Glucometer | 15 | $0.50 | $7.50 |
| Data Charges for Omron Wrist BPM | 13 | $1.00 | $13.00 |
| Data Charges for Tenovi BPM - S | 2 | $0.50 | $1.00 |
| Data Charges Subtotal: $11,308.00 | | | |
| Return Credit for Gateways | 3 | ($42.30) | ($126.90) |
| Other Charges Subtotal: ($126.90) | | | |
| Return Credit for Tenovi BPM | 3 | ($28.20) | ($84.60) |
| Data Charges Removed | 1 | ($11,308.00) | ($11,308.00) |
| Credits Subtotal: ($11,392.60) | | | |

| | |
|---|---|
| Subtotal: | $25,056.50 |
| Tax: | $0.00 |
| Total: | $25,056.50 |

**Memo:**

Monthly Auto-Generated Invoice



Printed Jun 2, 2025, 1:45:40 PM

**Address:**  1 Cate Street, Suite 100,
Portsmouth, NH 03801
**Tel:**  (714) 418-5658
**Account Rep:**  Devon Gerwolls
**Account Rep Email:**  dgerwolls@tenovi.com

# Detailed Invoice

**Bill To:**

Attn: ASR Invoice - May, 2025
MayaMD
8400 W Sunset Rd, Ste 300
Las Vegas, NV 89113

**Invoice Number:**  7770-25046

**Invoice Date:**  05/31/2025

**Billing Period (CLOSED):**  May, 2025

**Total Amount Due:**  $ 468.00

**Due Date:**  06/30/2025

**Amount Paid:**  $ 0.00

| Description | Qty | Unit Price | Amount |
|---|---|---|---|
| Up Front Charge for AAA Batteries - 4 Pack | 1 | $4.00 | $4.00 |
| Up Front Charge for AA Batteries - 4 Pack | 1 | $4.00 | $4.00 |
| Up Front Charge for BPM - XL Cuff | 6 | $6.00 | $36.00 |
| Up Front Charge for BPM - L Cuff | 19 | $6.00 | $114.00 |
| Up Front Charge for BPM - S Cuff | 9 | $6.00 | $54.00 |
| Up Front Charge for Gateway Power Supply | 4 | $6.00 | $24.00 |
| | | Device Charges Subtotal: | $236.00 |
| Shipping Charge for AAA Batteries - 4 Pack | 1 | $4.00 | $4.00 |
| Shipping Charge for AA Batteries - 4 Pack | 1 | $4.00 | $4.00 |
| Shipping Charge for BPM - XL Cuff | 6 | $6.00 | $36.00 |



Printed Jun 2, 2025, 1:45:40 PM

| Shipping Charge for BPM - L Cuff | 19 | $6.00 | $114.00 |
|---|---|---|---|
| Shipping Charge for BPM - S Cuff | 9 | $6.00 | $54.00 |
| Shipping Charge for Gateway Power Supply | 4 | $5.00 | $20.00 |
| Shipping Charges Subtotal: $232.00 | | | |
| | Subtotal: | | $468.00 |
| | Tax: | | $0.00 |
| | Total: | | $468.00 |

**Memo:**

Monthly Auto-Generated Invoice



Printed Jun 2, 2025, 1:45:17 PM

**Address:** 1 Cate Street, Suite 100,
Portsmouth, NH 03801

**Tel:** (714) 418-5658

**Account Rep:** Devon Gerwolls

**Account Rep Email:** dgerwolls@tenovi.com

# Detailed Invoice

**Bill To:**

Attn: Replacements Invoice - May, 2025
MayaMD
8400 W Sunset Rd, Ste 300
Las Vegas, NV 89113

**Invoice Number:** 7770-25047

**Invoice Date:** 05/31/2025

**Billing Period (CLOSED):** May, 2025

**Total Amount Due:** $ 213.30

**Due Date:** 06/30/2025

**Amount Paid:** $ 0.00

| Description | Qty | Unit Price | Amount |
|---|---|---|---|
| Up Front Charge for Tenovi BPM | 4 | $28.20 | $112.80 |
| Up Front Charge for Tenovi Pulse Ox | 1 | $28.20 | $28.20 |
| Up Front Charge for Gateway | 1 | $42.30 | $42.30 |
| | | Device Charges Subtotal: | $183.30 |
| Shipping Charge for Tenovi BPM | 4 | $4.00 | $16.00 |
| Shipping Charge for Tenovi Pulse Ox | 1 | $4.00 | $4.00 |
| Shipping Charge for Gateway | 1 | $10.00 | $10.00 |
| | | Shipping Charges Subtotal: | $30.00 |
| | | **Subtotal:** | **$213.30** |



Printed Jun 2, 2025, 1:45:17 PM

| | |
|---|---|
| **Tax:** | **$0.00** |
| **Total:** | **$213.30** |

**Memo:**

Monthly Auto-Generated Invoice

# Certificate of Acceptance #067 (Tenovi Co)

Final Audit Report                                                                    2025-06-03

| | |
|---|---|
| Created: | 2025-06-03 |
| By: | Rachel Jensen (rjensen@farnamstreet.net) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA88-64T6crwB60ArqEST8EwjIfEjfvwzJ |

## "Certificate of Acceptance #067 (Tenovi Co)" History

📄 Document created by Rachel Jensen (rjensen@farnamstreet.net)
    2025-06-03 - 2:44:35 PM GMT

📧 Document emailed to christian@mayamd.ai for signature
    2025-06-03 - 2:45:46 PM GMT

📄 Email viewed by christian@mayamd.ai
    2025-06-03 - 3:35:29 PM GMT

✍️ Signer christian@mayamd.ai entered name at signing as Christian Habermann
    2025-06-03 - 3:38:21 PM GMT

✍️ Document e-signed by Christian Habermann (christian@mayamd.ai)
    Signature Date: 2025-06-03 - 3:38:23 PM GMT - Time Source: server

✅ Agreement completed.
    2025-06-03 - 3:38:23 PM GMT



# EXHIBIT E



July 11, 2025

<u>VIA ELECTRONIC MAIL</u>
Christian Habermann
Co- Founder & COO
Maya MD Inc.
10330 Apache Blue Avenue
Las Vegas, NV 89135-1477
<u>christian@mayamd.ai</u>

Re: Lease Agreement Number MA090822 by and between Farnam Street Financial, Inc., as Lessor, and Maya MD Inc., as Lessee.

### *<u>NOTICE OF DEFAULT</u>*

Dear Mr. Habermann,

Maya MD Inc. is past due on monthly rental payments due under Lease Schedule No. 001 to Lease Agreement Number MA090822 (collectively the "Lease"). The present outstanding past due monthly lease rental totals $31,007.90, plus accrued late fees. Failure to pay these amounts is an Event of Default as that term is defined in section 16, sub-paragraph 1 of the Lease.

If this Event of Default under the Lease is not completely cured within ten (10) days of the date of this letter, without further notice or opportunity to cure, Farnam Street Financial will move to enforce its rights under the Lease, which may include, among other remedies, the acceleration of all current and future Monthly Lease Charges or payment of the Equipment's current casualty loss value.

Please be advised that under the terms of the Lease, the return of your security deposit and the opportunity to exercise your purchase option is conditioned upon no Event of Default having occurred.

If you have any questions, please contact Pat McPartland at 952- 351-4363.

Sincerely,
FARNAM STREET FINANCIAL, INC.

Steve Morgan
President

Cc:    Vipindas Chengat, Co-Founder- Maya MD Inc.
       Pat McPartland – Farnam Street
       Rachel Jensen – Farnam Street

5850 Opus Parkway, Suite 240
Minnetonka, MN 55343
952.908.0850 fax: 952.908.0796

# EXHIBIT F


**safford & baker**                                         Attorneys and Counselors

Ralph R. Safford
Donald H. Baker, Jr.

July 21, 2025

<u>Via Email Only to mhartfiel@farnamstreet.net</u>
Steve Morgan, President
Farnam Street Financial, Inc.
5850 Opus Parkway, Ste. 240
Minnetonka, MN 55343

Re:  Lease Agreement between Farnam and MayaMD/Notice of Default

Dear Mr. Morgan

I am responding on behalf of MayaMD, Inc. to the July 11, 2025 Notice of Default you emailed to Christian Habermann.

Maya has made an ACH payment of $31,007.90 which is represented in your default letter as the monthly lease total owed. (Invoice 613978, hereinafter "**Exhibit A**"). Maya believes that the actual amount owed may be $30,461.05, which is the amount of principal and late fee recorded for the July 1 rental payment in the list of late charges sent late Friday by Pat McPartland to Christian. We would like to discuss this with Farnam representatives, along with other matters as noted below.

Maya is not paying the additional late fees included in the email from Pat McPartland at this time. These fees have not previously been billed to Maya. The lease provides (in paragraph 3) that "Late Charges shall be charged and added to any past due amount on the date such payment is due and every thirty (30) days thereafter. . . " This was not done for the majority of the late charges included in the amount billed for the first time on Friday and may be deemed waived by Farnam. In addition, Maya is in the process of checking its billing and payment records to determine if various payments referred to have been correctly recorded by Farnam. Finally, inasmuch as this bill for late charges has just been received, if the amount is due, nonpayment would be a separate default and Maya would be entitled to 10 days to cure that separate default. We would like to discuss and hopefully resolve the late charge issue with Farnam representatives.

There are several other issues with the lease that Maya would like to discuss as well. Would you or your counsel please let me know how and when to best schedule a call, and how you would staff the call, so that Maya can plan accordingly.

I am copying your counsel, Mr. Ashfield, by email on this communication.

Sincerely,

Ralph R. Safford

Cc:     Christian Habermann (via email only)
        Phillip J. Ashfield (via email only to pashfield@spencerfane.com)
        Pat McPartland (via email only to pmcpartland@farnamstreet.net)

# **EXHIBIT A**

# Invoice 613978

June 2, 2025
Page 1 / 3



Contract #: MA090822-001
Total Due: $30,010.89
Due Date: July 1, 2025

**Farnam Street Financial, Inc.**
5850 Opus Parkway, Suite 240
Minnetonka, MN 55343

**Maya MD Inc.**
Vipindas Chengat
10330 Apache Blue Ave
Las Vegas, NV 89135-1477
USA

https://www.farnamstreet.net
Phone: (952) 908-0850
accounting@farnamstreet.net

| Description | Amount (USD) |
|---|---:|
| Equipment Location: 8400 W Sunset Rd, Las Vegas, NV, 89113-2283 | |
| Interim Rent Due on CofA No. 001 from 7/1/2025 to 7/31/2025 | 503.11 |
| Sales/Use Tax | 42.14 |
| Interim Rent Due on CofA No. 002 from 7/1/2025 to 7/31/2025 | 724.73 |
| Sales/Use Tax | 60.70 |
| Interim Rent Due on CofA No. 003 from 7/1/2025 to 7/31/2025 | 76.58 |
| Sales/Use Tax | 6.41 |
| Interim Rent Due on CofA No. 004 from 7/1/2025 to 7/31/2025 | 132.93 |
| Sales/Use Tax | 11.13 |
| Interim Rent Due on CofA No. 005 from 7/1/2025 to 7/31/2025 | 794.18 |
| Sales/Use Tax | 66.51 |
| Interim Rent Due on CofA No. 006 from 7/1/2025 to 7/31/2025 | 14.06 |
| Sales/Use Tax | 1.18 |
| Interim Rent Due on CofA No. 007 from 7/1/2025 to 7/31/2025 | 177.62 |
| Sales/Use Tax | 14.88 |
| Interim Rent Due on CofA No. 008 from 7/1/2025 to 7/31/2025 | 80.91 |
| Sales/Use Tax | 6.78 |
| Interim Rent Due on CofA No. 009 from 7/1/2025 to 7/31/2025 | 678.73 |
| Sales/Use Tax | 56.84 |
| Interim Rent Due on CofA No. 010 from 7/1/2025 to 7/31/2025 | 956.86 |
| Sales/Use Tax | 80.14 |
| Interim Rent Due on CofA No. 011 from 7/1/2025 to 7/31/2025 | 67.62 |
| Sales/Use Tax | 5.66 |
| Interim Rent Due on CofA No. 012 from 7/1/2025 to 7/31/2025 | 102.25 |
| Sales/Use Tax | 8.56 |
| Interim Rent Due on CofA No. 013 from 7/1/2025 to 7/31/2025 | 435.50 |
| Sales/Use Tax | 36.47 |
| Interim Rent Due on CofA No. 014 from 7/1/2025 to 7/31/2025 | 819.37 |
| Sales/Use Tax | 68.62 |
| Interim Rent Due on CofA No. 015 from 7/1/2025 to 7/31/2025 | 1,277.14 |
| Sales/Use Tax | 106.96 |
| Interim Rent Due on CofA No. 016 from 7/1/2025 to 7/31/2025 | 819.33 |
| Sales/Use Tax | 68.62 |
| Interim Rent Due on CofA No. 017 from 7/1/2025 to 7/31/2025 | 515.73 |
| Sales/Use Tax | 43.19 |
| Interim Rent Due on CofA No. 018 from 7/1/2025 to 7/31/2025 | 830.46 |
| Sales/Use Tax | 69.55 |
| Interim Rent Due on CofA No. 019 from 7/1/2025 to 7/31/2025 | 104.13 |
| Sales/Use Tax | 8.72 |
| Interim Rent Due on CofA No. 020 from 7/1/2025 to 7/31/2025 | 96.81 |
| Sales/Use Tax | 8.11 |

**Invoice 613978**

June 2, 2025
Page  2 / 3

| | |
|---|---|
| Interim Rent Due on CofA No. 021 from 7/1/2025 to 7/31/2025 | 429.47 |
| Sales/Use Tax | 35.97 |
| Interim Rent Due on CofA No. 022 from 7/1/2025 to 7/31/2025 | 402.80 |
| Sales/Use Tax | 33.73 |
| Interim Rent Due on CofA No. 023 from 7/1/2025 to 7/31/2025 | 194.99 |
| Sales/Use Tax | 16.33 |
| Interim Rent Due on CofA No. 024 from 7/1/2025 to 7/31/2025 | 765.48 |
| Sales/Use Tax | 64.11 |
| Interim Rent Due on CofA No. 025 from 7/1/2025 to 7/31/2025 | 348.55 |
| Sales/Use Tax | 29.19 |
| Interim Rent Due on CofA No. 026 from 7/1/2025 to 7/31/2025 | 180.12 |
| Sales/Use Tax | 15.09 |
| Interim Rent Due on CofA No. 027 from 7/1/2025 to 7/31/2025 | 159.92 |
| Sales/Use Tax | 13.39 |
| Interim Rent Due on CofA No. 028 from 7/1/2025 to 7/31/2025 | 71.46 |
| Sales/Use Tax | 5.98 |
| Interim Rent Due on CofA No. 029 from 7/1/2025 to 7/31/2025 | 322.26 |
| Sales/Use Tax | 26.99 |
| Interim Rent Due on CofA No. 030 from 7/1/2025 to 7/31/2025 | 281.16 |
| Sales/Use Tax | 23.55 |
| Interim Rent Due on CofA No. 031 from 7/1/2025 to 7/31/2025 | 91.56 |
| Sales/Use Tax | 7.67 |
| Interim Rent Due on CofA No. 032 from 7/1/2025 to 7/31/2025 | 68.71 |
| Sales/Use Tax | 5.75 |
| Interim Rent Due on CofA No. 033 from 7/1/2025 to 7/31/2025 | 96.81 |
| Sales/Use Tax | 8.11 |
| Interim Rent Due on CofA No. 034 from 7/1/2025 to 7/31/2025 | 76.03 |
| Sales/Use Tax | 6.37 |
| Interim Rent Due on CofA No. 035 from 7/1/2025 to 7/31/2025 | 140.81 |
| Sales/Use Tax | 11.79 |
| Interim Rent Due on CofA No. 036 from 7/1/2025 to 7/31/2025 | 60.43 |
| Sales/Use Tax | 5.06 |
| Interim Rent Due on CofA No. 037 from 7/1/2025 to 7/31/2025 | 178.33 |
| Sales/Use Tax | 14.94 |
| Interim Rent Due on CofA No. 038 from 7/1/2025 to 7/31/2025 | 377.39 |
| Sales/Use Tax | 31.61 |
| Interim Rent Due on CofA No. 039 from 7/1/2025 to 7/31/2025 | 166.25 |
| Sales/Use Tax | 13.92 |
| Interim Rent Due on CofA No. 040 from 7/1/2025 to 7/31/2025 | 462.35 |
| Sales/Use Tax | 38.72 |
| Interim Rent Due on CofA No. 041 from 7/1/2025 to 7/31/2025 | 249.02 |
| Sales/Use Tax | 20.86 |
| Interim Rent Due on CofA No. 042 from 7/1/2025 to 7/31/2025 | 148.23 |
| Sales/Use Tax | 12.41 |
| Interim Rent Due on CofA No. 043 from 7/1/2025 to 7/31/2025 | 791.08 |
| Sales/Use Tax | 66.25 |
| Interim Rent Due on CofA No. 044 from 7/1/2025 to 7/31/2025 | 257.96 |
| Sales/Use Tax | 21.60 |
| Interim Rent Due on CofA No. 045 from 7/1/2025 to 7/31/2025 | 14.28 |
| Sales/Use Tax | 1.20 |
| Interim Rent Due on CofA No. 046 from 7/1/2025 to 7/31/2025 | 610.97 |
| Sales/Use Tax | 51.17 |
| Interim Rent Due on CofA No. 047 from 7/1/2025 to 7/31/2025 | 130.14 |
| Sales/Use Tax | 10.90 |
| Interim Rent Due on CofA No. 048 from 7/1/2025 to 7/31/2025 | 1,861.95 |
| Sales/Use Tax | 155.94 |
| Interim Rent Due on CofA No. 049 from 7/1/2025 to 7/31/2025 | 63.17 |

**Invoice 613978**

June 2, 2025
Page 3 / 3

| | |
|---|---:|
| Sales/Use Tax | 5.29 |
| Interim Rent Due on CofA No. 050 from 7/1/2025 to 7/31/2025 | 75.05 |
| Sales/Use Tax | 6.29 |
| Interim Rent Due on CofA No. 051 from 7/1/2025 to 7/31/2025 | 1,492.88 |
| Sales/Use Tax | 125.03 |
| Interim Rent Due on CofA No. 052 from 7/1/2025 to 7/31/2025 | 119.51 |
| Sales/Use Tax | 10.01 |
| Interim Rent Due on CofA No. 053 from 7/1/2025 to 7/31/2025 | 1,611.15 |
| Sales/Use Tax | 134.93 |
| Interim Rent Due on CofA No. 054 from 7/1/2025 to 7/31/2025 | 146.04 |
| Sales/Use Tax | 12.23 |
| Interim Rent Due on CofA No. 055 from 7/1/2025 to 7/31/2025 | 3.06 |
| Sales/Use Tax | 0.26 |
| Interim Rent Due on CofA No. 056 from 7/1/2025 to 7/31/2025 | 482.49 |
| Sales/Use Tax | 40.41 |
| Interim Rent Due on CofA No. 057 from 7/1/2025 to 7/31/2025 | 1,059.69 |
| Sales/Use Tax | 88.75 |
| Interim Rent Due on CofA No. 058 from 7/1/2025 to 7/31/2025 | 64.85 |
| Sales/Use Tax | 5.43 |
| Interim Rent Due on CofA No. 059 from 7/1/2025 to 7/31/2025 | 3.18 |
| Sales/Use Tax | 0.27 |
| Interim Rent Due on CofA No. 060 from 7/1/2025 to 7/31/2025 | 521.63 |
| Sales/Use Tax | 43.69 |
| Interim Rent Due on CofA No. 061 from 7/1/2025 to 7/31/2025 | 93.47 |
| Sales/Use Tax | 7.83 |
| Interim Rent Due on CofA No. 062 from 7/1/2025 to 7/31/2025 | 39.64 |
| Sales/Use Tax | 3.32 |
| Interim Rent Due on CofA No. 063 from 7/1/2025 to 7/31/2025 | 1,446.65 |
| Sales/Use Tax | 121.16 |
| Interim Rent Due on CofA No. 064 from 7/1/2025 to 7/31/2025 | 15.64 |
| Sales/Use Tax | 1.31 |
| Interim Rent Due on CofA No. 065 from 7/1/2025 to 7/31/2025 | 1,168.84 |
| Sales/Use Tax | 97.89 |
| Interim Rent Due on CofA No. 066 from 7/1/2025 to 7/31/2025 | 1,138.20 |
| Sales/Use Tax | 95.32 |
| Location Subtotal:  $30,010.89 | |

| | |
|---|---:|
| **Grand Total Due $** | **30,010.89** |

# EXHIBIT G

**DRAFT**
**FARNAM PROPOSAL**
**AUGUST 25, 2025**
**ATTORNEY WORK PRODUCT**


# MAYAMD's PROPOSAL TO FARNAM

**Overview**

MayaMD, Inc. ("**Maya**" or "**MayaMD**") and Farnam Street Financial ("**Farnam**") entered into an agreement in September 2022 for Farnam to lease durable medical equipment ("**DME**") for 30-months, which would commence on March 1, 2023 after an estimated six-month equipment purchase and installation period ("**Lease Agreement**"). *See Schedule No. 1*. The Lease Agreement was executed during the COVID-19 pandemic.

When the Lease Agreement was signed, COVID 19 protocols and waivers were in place. As long as there was no fraud and abuse concern,[1] copay waivers were available for Medicare, Medicaid and TRICARE ("**Government Program**") beneficiaries.  At this time, it was unknown how long the waivers would continue or what impact the termination of the waivers would have on patient enrollment, including current enrollees. Notably, even health care lawyers were relaying, "[o]f note, neither CMS nor OIG has explained how providers should plan to unwind arrangements that fall under the blanket waivers when the COVID-19 public health emergency ends."[2]

MayaMD had no previous experience with remote patient monitoring ("**RPM**")/chronic care management ("**CCM**") or the lease of DME to support such services. Remote delivery of patient monitoring services became prevalent during COVID. As required under the Lease Agreement, MayaMD selected the type of DME, as well as the manufacturer and the number of equipment units. By way of contrast, Farnam' claims to have expertise in leasing DME and "specializes in designing customized lease financing solutions for companies acquiring technology and business essential assets."[3] According to Farnam's website, "[l]easing your healthcare and IT equipment is a financially sound decision that helps you keep pace with industry trends. … With a Farnam Street lease solution, your lease can be restructured at any time to accommodate a new upgrade or acquisition in the most cost-effective way possible."[4]

The lease schedule provides a monthly payment of $27,936.49.  30 months of this payment is equal to $838,094.70.  If the $800,000 cost of the equipment to be purchased by Farnam for lease to

---

[1] *See* https://oig.hhs.gov/coronavirus/OIG-Policy-Statement-4.3.20.pdf (Apr. 30, 2020).
[2] AHLA, *Anti-Kickback Leniency During COVID-19 Pandemic* (Apr. 17, 2020), https://www.americanhealthlaw.org/content-library/health-law-weekly/article/4af7e108-0828-4571-aece-cd7b4baf6b8e/anti-kickback-leniency-during-covid-19-pandemic#_edn1.
[3] www.franamstreet.net (last visited Aug. 20, 2025).
[4] *See* https://www.farnamstreet.net/leasing-customers (last visited Jul. 27, 2025).

**DRAFT**
**FARNAM PROPOSAL**
**AUGUST 25, 2025**
**ATTORNEY WORK PRODUCT**

Maya is spread evenly over the anticipated 6-month installation period, the monthly equipment cost is $133,000. Multiplying this by the interim monthly rent charge of .034921 per $1.00 found in the lease (rounded to $.04 per $1.00), equates to the following:

| | |
|---|---|
| Month 1 | $5,332.32 |
| Month 2 | 10,666.64 |
| Month 3 | 15,999.96 |
| Month 4 | 21,333.28 |
| Month 5 | 26,666.60 |
| Month 6 | 31,999.92 |
| **Total** | **$ 111,999.72** |

Grand Total: $838,094.70 + $111,999.72= $950,094.42 which is the approximate total amount Farnam expected to receive, and Maya expected to pay.

Lease Agreement Section 4 addresses "TAXES." Specifically,

> In addition to the Lease Charges set forth in Section 3, the Lessee shall reimburse Lessor for all license or registration fees, assessments, sales and use taxes, rental taxes, gross receipts taxes, personal property taxes and other taxes now or hereafter imposed by any government, agency, province or otherwise upon the Equipment, the Lease Charges or upon the ownership, leasing, renting, purchase, possession or use of the Equipment, whether the same be assessed to Lessor or Lessee (the "Taxes"). Lessor shall file all property tax returns and pay all Taxes when due. Lessee, upon notice to Lessor, may, in Lessee's own name, contest or protest any Taxes, and Lessor shall honor any such notice except when in Lessor's sole opinion such contest is futile or will cause a levy or lien to arise on the Equipment or cloud Lessor's title thereto. Lessee shall, in addition, be responsible Lessor for the payment and discharge of any penalties or interest as a result of Lessee's actions or inactions. Nothing herein shall be construed to require Lessee to be responsible for any federal or state taxes or payments in lieu thereof, imposed upon or measured by the next income of Lessor, or state franchise taxes of Lessor, or except as provided hereinabove, any penalties or interest resulting from Lessor's failure to timely remit such tax payments.

To date, Maya has paid $653,188.83, which includes the initial security deposit of $55,872.70 and monthly interim rent invoices, almost all of which include sales tax charges. The approximate amount of sales taxes charged and collected by Farnam is $40,000.

The Lease Agreement raises three main legal issues: (1) the illegality of charging and collecting sales tax on the lease of DME; (2) The failure to include federal mandated fair market value ("**FMV**") definitions in the Lease Agreement; and (3) the return provisions of the Lease Agreement violate HIPAA.

DRAFT
FARNAM PROPOSAL
AUGUST 25, 2025
ATTORNEY WORK PRODUCT


 **Illegal collection of sales tax**

Farnam illegally collected state sales/personal use taxes of the lease of the DME to Maya.  This is expressly prohibited by the Medicare Manual and MN law (as well as other states). In MN, these items (e.g., blood pressure cuffs, pulse-ox and glucometers) cannot be taxed when (1) they are sold for home use; and (2) covered by Medicare or Medicaid regardless of whether they are paid for by an individual, Medicare, Medicaid, or a private insurer. This applies even if the equipment is not sold for home use.

As part of its program, MayaMD monitors patients through RPM and CCM who use the leased units in their home. Moreover, MayaMD has no "cash pay" patients, meaning that the individuals using the leased DME have coverage through Medicare, Medicaid or a private insurer.

Farnam's charging and collection of "sales and use taxes" in Section 4 of the Lease Agreement runs afoul of Minnesota state tax law and Medicare regulations. Given Farnam's claimed extensive experience with medical device leases, it had actual knowledge of or recklessly disregarded Minnesota tax law and Medicare regulations in charging and collecting "sales tax" on its invoices which it was prohibited from doing under Minnesota law and Medicare regulations. Farnam knowingly put a material contractual provision in its Lease Agreements that violates state and federal law when DME is the equipment being leased and is either used by the patient at home and/or paid for by Medicare, Medicaid or a third-party insurer.


## Fair Market Value

While it is undisputed that there is no intent between the parties to induce referrals, the Anti-Kickback Statute ("AKS") applies to all transactions in which Medicare or Medicaid payments are involved, including leases of DME.

 In order for a lessor of DME to come within the AKS safe harbor, 42 CFR § 1001.952(c), six (6) elements must be met. Specifically:

**(c)** *Equipment rental.* As used in section 1128B of the Act, "remuneration" does not include any payment made by a lessee of equipment to the lessor of the equipment for the use of the equipment, as long as all of the following six standards are met—

**(1)** The lease agreement is set out in writing and signed by the parties.

**(2)** The lease covers all of the equipment leased between the parties for the term of the lease and specifies the equipment covered by the lease.

**(3)** If the lease is intended to provide the lessee with use of the equipment for periodic intervals of time, rather than on a full-time basis for the term of the lease, the lease specifies exactly the schedule of such intervals, their precise length, and the exact rent for such interval.

3

DRAFT
FARNAM PROPOSAL
AUGUST 25, 2025
ATTORNEY WORK PRODUCT

**(4)** The term of the lease is for not less than one year.

**(5)** The aggregate rental charge is set in advance, is consistent with fair market value in arms-length transactions **and** is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or all other Federal health care programs.

**(6)** The aggregate equipment rental does not exceed that which is reasonably necessary to accomplish the commercially reasonable business purpose of the rental. Note that for purposes of paragraph (c) of this section, the term *fair market value* means that the value of the equipment when obtained from a manufacturer or professional distributor, but shall not be adjusted to reflect the additional value one party (either the prospective lessee or lessor) would attribute to the equipment as a result of its proximity or convenience to sources of referrals or business otherwise generated for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs. (Emphasis added).

Farnam failed to meet 1001.952(c)(5), (6).

Moreover, HHS-OIG Advisory Opinion No. 10-14[5] evaluated this safe harbor, which is specific to the redacted requesting person and highlighted FMV.

> The Arrangement does not appear to include suspect characteristics of the problematic "under arrangements" transactions described in the examples above. For instance: **compensation under the Arrangement is fair market value (and not at above- or below-market rates)**; Requestor, the "under arrangements" supplier, is not owned by the Hospital or any physicians; no supplemental services, such as marketing, are provided to the Hospital by Requestor; and no DME or other items or services are provided by Requestor to the Hospital, Hospital patients, or patients tested at the sleep testing facility, directly or indirectly, in connection with the Arrangement.

This violation has occurred in two ways. First, Maya is being required to pay rates that are higher than FMV because they are demonstrably not arms-length or reasonably necessary to accomplish the commercially reasonable business purpose of the rental, which was and is to accomplish payment to Farnam of $950,000. Payment of any amount appreciably higher than $950,000 is not reasonably necessary to accomplish this reasonable business purpose, and the amount required under the Lease Agreement is clearly violative of this definition of FMV.

Second, various provisions in the Lease Agreement, including Sections 7 (Return to Lessor), Section 12 (Loss and Damage) and Section 17 do not take into account the useful life of the individual devices, depreciation, or the DME being off premises and out of Lessee's control. By the end of the lease term, the DME will have a FMV lower than the cost of returning it to Farnam, because of their condition, the fact that they are used, and the fact that new, unused and superior quality substitutes will be available at lower prices, In sum, the current Lease Agreement is inconsistent with federal FMV requirements for the health care industry. This FMV requirement applies to all leases of DME, whether or not there are improper referral provisions in the lease.

---

[5] *See* https://oig.hhs.gov/documents/advisory-opinions/602/AO-10-14.pdf (Aug. 30, 2010).

DRAFT
FARNAM PROPOSAL
AUGUST 25, 2025
ATTORNEY WORK PRODUCT

## The return provisions of the lease violate the Health Insurance Portability and Accountability Act of 1996 (HIPAA)

**Section 7 – Return to Lessor**. The return of the equipment including the original packaging makes this provision commercially impracticable. Moreover, what it requires potentially violates HIPAA and there is no Business Associate Agreement, 45 CFR 164.504 (**BAA**) between MayaMD and Farnam, despite Farnam's express requirement that data must be wiped from the devices before they are returned. This is a core component of a BAA; yet, Farnam fails to address the issue of receiving a device that is not wiped or has not been updated by the manufacturer – an issue that is not Maya's responsibility.

 "At such time as the Equipment is delivered to the Lessor at the Return Location, the Equipment will be at risk of Lessor. In the case of Equipment that is software or related implementation services, Lessee will erase, delete and destroy all electronic incidents of software, and deliver to Lessor all tangible items constituting software. At Lessor's request, Lessee will also certify in a written form acceptable to Lessor that: (1) all tangible Software has been delivered to Lessor; (ii) all intangible records have been destroyed; (iii) Lessee has not retained the software in any form; (iv) Lessee will not use the Software after the termination date of a Lease Schedule; and (v) Lessee has not received from the software supplier(s) anything of value relating to or in exchange for Lessee's use, rental or possession of the software during the duration of the applicable Lease Schedule (including a trade-in, substitution or upgrade allowance)."

This is not only impractical - the requirement to destroy software defies logic. If "all electronic incidents of software" are "destroyed" then the equipment will not function.

## Conclusion

The Lease Agreement contains provisions which violate state and/or federal law as summarized above. In light of these issues, Maya makes the following proposal:

1. Convert the lease to a purchase of the equipment, with the price to be paid to Farnam for the equipment equal to the payments it originally anticipated receiving ($950,000). This will give Farnam the benefit of its original bargain and not penalize MayaMD. From this purchase price, MayaMD would receive credit for the amount it has paid Farnam to date, including the amount improperly collected  for sales taxes. In rough numbers this would $950,000 less $650,000 equals $300,000. This balance Maya proposes to pay monthly over, say, 18 months.

2. The lease does have a purchase option, which could also be used.  The parties could agree to terminate the lease now and agree on the $300,000 purchase price for the DME.  The parties could also agree on the terms of payment of this purchase price, and permit Maya

5

**DRAFT**
**FARNAM PROPOSAL**
**AUGUST 25, 2025**
**ATTORNEY WORK PRODUCT**

to pay monthly. Kindly let us know if this proposal is acceptable to Farnam. Since Maya is still paying interim rent at a higher rate that the monthly rent applicable during the 30 month term, we would appreciate an expedited response.