UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **MAYA MD, Inc.,**<br><br>Plaintiff,<br><br>v.<br><br>**Farnam Street Financial, Inc.,**<br><br>Defendant. | Case No. 0:25-cv-04522<br><br>**AMENDED<br>COMPLAINT** |

Plaintiff Maya MD, Inc. ("**Maya**" or "**Plaintiff**"), by and through counsel, respectfully files this Complaint and alleges the following against Defendant Farnam Street Financial, Inc. ("**Farnam**" or "**Defendant**") (collectively, these entities are known as the "**Parties**").

## PRELIMINARY STATEMENT

1. This case concerns alleged deceptive lending and trade practices related to healthcare equipment financing by Farnam, as well as breach of contract claims.

2. On September 15, 2022, during the COVID-19 Public Health Emergency ("**COVID**" or "**PHE**"), Maya and Farnam executed Lease Agreement MA090822 and Lease Schedule NO. 001 ("**Agreement**"). (**Exhibit A**). At the time the Agreement was executed, COVID protocols and waivers were in place, including copay waivers for Medicare, Medicaid and TRICARE ("**Government Programs**") beneficiaries.

3.     In September 2022, there was no known date provided by the Government as to when the copay waivers would end or the impact that reinstating the copay requirement would have on Maya's business. The majority of Maya's patients then and now are Medicare and Medicaid beneficiaries; however, when the PHE copay waivers ended, patient enrollment stagnated.

4.     Farnam drafted the Agreement, which provided for a thirty (30) month lease estimated to commence on March 1, 2023, following an estimated six (6) month installation period (hereinafter "**Installation Period**"). During the Installation Period, Maya would order and Farnam would purchase durable medical equipment ("**DME**"), selected by Maya at the approximate total price of $800,000.

5.     Maya was unable to enroll the number of patients in its remote patient monitoring ("**RPM**") [1] or chronic care monitoring ("**CCM**")[2] (collectively "**RPM/CCM**") program it anticipated within six months as estimated at the time the Agreement was signed. This delayed Maya's scheduled order of DME. Maya finally completed the order of approximately $800,000 in DME in June 2025.

---

[1] CMS, MLN901705, p. 9 (Apr. 2025), https://www.cms.gov/files/document/mln901705-telehealth-remote-patient-monitoring.pdf (indicating that RPM has three main components: (1) patient education and medical device setup; (2) medical device supply (connecting the device and patient frequency); and (3) treatment management services (reviewing patient data to improve patient outcomes)).

[2] CMS MLN909188, p. 3 (Jun. 2025), https://www.cms.gov/files/document/chroniccaremanagement.pdf (defining CCM as "managing a patient's multiple (2 or more) chronic conditions expected to last at least 12 months, or until their death. Chronic conditions place the patient at significant risk of death, acute exacerbation or decompensation, or functional decline. CCM is a critical primary care service that contributes to better patient health and care.").

6. For over 21 years, Farnam, as an independent leasing company, has served specialized markets, including technology, healthcare, retail and manufacturing.[3] According to Farnam's website, "[l]easing your healthcare and IT equipment is a financially sound decision that helps you keep pace with industry trends.…With a Farnam Street lease solution, your lease can be restructured at any time to accommodate a new upgrade or acquisition in the most cost-effective way possible."[4] Maya's experience has run contrary to Farnam's public assertions.

7. Maya's remote patient care falls under the categories of RPM/CCM. Both its RPM and CCM services are provided to patients of nephrology practices, which require the home use of DME. RPM services were first approved to be used in treating Medicare and Medicaid patients in 2019 by the Centers for Medicare and Medicaid Services ("**CMS**"), so its deployment was novel. Specific types of DME which are relevant to the Agreement include blood pressure monitors and cuffs, glucometers, pulse oximeters and cellular gateway devices to facilitate electronic transmission of device readings. According to Maya's website,

> The provider identifies a patient who would be a good fit for RPM [Remote Physiologic Management], then we will check their eligibility. We will provide them with one of our FDA approved RPM devices and help them get acclimated with it.[5]

---

[3] https://www.farnamstreet.net/#our-customers (last visited Oct. 21, 2025).
[4] *See* https://www.farnamstreet.net/leasing-customers (last visited Oct. 21, 2025).
[5] *See* https://www.mayamd.ai/solutions/remote-patient-monitoring (last visited Oct. 21, 2025).

3

8. Sometimes Maya bills government programs, including Medicare and Medicaid, and other times the provider bills Medicare and Medicaid – it depends on the terms of the contract.

9. Despite its asserted experience with financing healthcare equipment for over two (2) decades, Farnam knowingly required that Maya pay any "sales and use taxes" pursuant to Section 4 of the Agreement. Farnam has invoiced Maya, and Maya has paid, Minnesota sales taxes computed at 8.53% on the amounts Farnam has charged Maya for leasing the DME, which is included in its invoices and totals upwards of $60,000. A representative invoice is attached as **Exhibit B**.

10. Once Maya completed ordering its DME, Farnam demanded that Maya sign a revised Lease Schedule No. 001R which purports to list all of the DME which had been delivered to Maya between September 2022 and June 2025. A copy of revised Lease Schedule No. 001R is in the possession of Farnam. Maya objected to signing the revised Lease Schedule because it purported to include all DME, even DME which had been installed for over 30 months. Maya's counsel's letter dated June 30, 2025, which states the objections is attached as **Exhibit C**.

11. Farnam's counsel responded in a letter dated July 11, 2025, and demanded that Maya sign the revised Lease Schedule No. 001R. (**Exhibit D**). When Maya did not do so and did not pay additional interim rent, Farnam declared a default. A copy of the July 11, 2025, default notice is attached as **Exhibit E**.

4

12. Maya thereafter cured the alleged default and continued paying Farnam invoices under protest, at the amount demanded by Farnam. Maya's counsel's July 21, 2025, letter objecting to the default notice is attached as **Exhibit F**.

13. Following a call between counsel, Maya made a settlement proposal, a copy of which is attached as **Exhibit G**. Farnam has rejected all settlement offers and suggestions of mediation or arbitration.

14. From the Agreement's inception, Farnam deceived Maya, unlawfully collected state sales/use taxes (Agreement Section 4), and breached the Agreement because: (a) Farnam did not enter into a business associate agreement ("**BAA**") as required under HIPAA implementing regulation 45 C.F.R. § 164.504; (b) the Agreement required medical equipment that had been distributed to and utilized by patients in their homes to be "deinstalled, packed using the manufacturer's original packaging materials and shipped to [Farnam's] chosen location"; (c) the Agreement required that Maya "erase, delete and destroy all electronic incidents of software, and deliver to Lessor all tangible items constituting software." (Agreement, Section 7); and (d) the Agreement requires payments by Maya which materially exceed fair market value, in violation of the Social Security Amendments of 1965, as well as other federal law.

15. If delivery of the DME is not returned in accordance with the above requirements (Par.14b and 14c), Agreement Section 12 mandates that one-hundred percent of the initial cost of the DME plus interest or two (2) times the Casualty Loss Value applies, which exceeds fair market value because the useful life of the equipment at the time of installation was approximately three (3) years, and by the time the equipment is returned,

it will have a FMV of nearly zero.  In addition, much of the leased equipment (e.g., glucometers) cannot be used by a different patient and therefore cannot be reused.

16. In sum, Maya has been harmed by Farnam's actions and despite its assertions on its website, as recently as October 2025, Farnam would not restructure the Agreement.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332. Section 1331 is applicable because the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191 (Aug. 21, 1996), as well as the implementing regulations (collectively "**HIPAA**") and the Social Security Amendments, Pub. L. 89-97 (Jul. 30, 1965) apply. Section 1332 is applicable because the Parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18. This Court has personal jurisdiction over the Defendants because the Defendant has at least minimum contacts with the United States, and can be found in, resides, or transacts or has transacted business, in Minnesota.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the Defendant's headquarters are located in Minnetonka, Minnesota and the events giving rise to this matter occurred in this District.

20. The Agreement contains jurisdiction and venue provisions consistent with the filing of this action in this district.  The parties have agreed in the Agreement that Minnesota law applies.  Agreement, **Exhibit A**, Section 25.

## PARTIES

*Plaintiff*

21. Maya is a corporation incorporated in Nevada with its principal place of business at 8400 W. Sunset Avenue, Las Vegas, Nevada 89113 and is a citizen of Nevada. Maya focuses on three core services: (1) remote patient care; (2) physician AI; and (3) digital patient discharge. Maya has been in business since November 2018 and began offering remote patient care services in 2022.

*Defendant*

22. Farnam is a corporation incorporated in Minnesota with its principal place of business at 5850 Opus Parkway, Suite 240, Minnetonka, Minnesota 55343 and is a citizen of Minnesota. Farnam focuses on financing for businesses in technology and healthcare, among others. For the past twenty-one (21) years, it has touted its industry knowledge to find creative financing solutions.

## LEGAL FRAMEWORK

23. The DME identified in the Lease Schedule No. 001, are medical devices that are exempt from Minnesota sales and use tax pursuant to Minn. Statute, 297A.67Subd(7)(a),,(5), (b)(1),(2) and 297A.67Subd 7a because they either have a single use component (i.e., glucometer test strips and lancets), or are used at home and are covered by Medicare as defined under Title XVIII, 42 U.S.C. §1395, et seq. or Medicaid, Title XIX, 42 U.S.C. § 1396, et seq. Accordingly, it is illegal under Minnesota law for Farnam to charge and collect sales tax from Maya under the Agreement.

24. All of the DME leased by Farnam to Maya was delivered to medical clinics,

patients, or Maya itself by the company from whom Farnam purchased the DME. The DME was never located in Minnesota. The DME was delivered to states other thanMinnesota. Farnam knew that the DME was being delivered to states other than Minnesota. Farnam knew, or should have known, that virtually all of the states in which the DME was delivered exempted DME from sales/use tax. Because the DME was shipped to states that did not impose sales/use tax on DME, the lease of the DME was exempt from sales/use tax under Minnesota law. Minn. Stat. Section 297A.68, Subd 13.

25.     Although 42 U.S.C. § 1395m does not expressly cover state sales or use tax for DME, the Medicare Claims Processing Manual, Pub. 100-04, Section 80.3.1A, expressly instructs Medicare Audit Contractors ("**MACs**") that,

> Sales taxes where appropriate were included in the calculation of reasonable charges computed. They were also accounted for in the calculation of the base fee schedules for DME and orthotic/prosthetic devices. The Consumer Price Index used to update fee schedules also accounts for sales tax. Therefore, MACs do not make additional payment for sales taxes and do not make adjustments in fees to reflect local changes in rates.[6]

26.     Agreement Section 4 provides that Maya must reimburse Farnam for any taxes imposed by a governmental agency on the DME or ownership, leasing, renting, possession or use of the DME. Farnam knew or should have known that collecting sales or use tax was illegal because Medicare does not reimburse separately for sales tax for the types of DME leased by Farnam. Farnam knew the types of DME that Maya was leasing. To date, Farnam has collected upwards of $60,000.00 in state sales/use tax from Maya. Therefore, Farnam acted unlawfully when it collected state sales/use tax.

[6] https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c23.pdf (Rev. 13216; May 9, 2025).

## DECEPTIVE TRADE PRACTICES ACT AND BREACH OF CONTRACT ALLEGATIONS

27. Agreement Sections 4, 7, and 12 are not health care industry specific and violate state and federal law. By providing the Farnam-drafted Agreement to Maya, Farnam deceived Maya and acted illegally by failing to sign a BAA which was required because Farnam could request an inventory of medical device ID numbers and patients, as well as requiring Maya to erase, delete and destroy all electronic incidents of software from the DME, which is impossible and would result in DME being returned to Farnam with individually identifiable health information that could be linked back to a patient. Additionally, Farnam collected sales/use tax in violation of state and federal law.

28. Farnam's language on its website and in its agreements causes confusion and results in misleading statements. Instead of restructuring or refining its terms for the lease of DME, Farnam refuses to invoke the unilateral arbitration provision in the Agreement and has not offered to return the state sales/use tax that it collected. Instead, it seeks to unjustly enrich itself while engaging in deceptive trade practices and holding Maya to an illegal agreement.

### Deceptive Trade Practices

29. Minn. Stat. §325D.44(1) states that a person engages in deceptive trade practices when, it in part, "(14) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." To prevail, Maya need not prove actual confusion or misunderstanding. Minn. Stat. §325D.44(2).

30. Farnam engaged in conduct designed to create confusion and misunderstanding when it relayed on its website that "[l]easing your healthcare and IT equipment is a financially sound decision that helps you keep pace with industry trends.…With a Farnam Street lease solution, your lease can be restructured at any time to accommodate a new upgrade or acquisition in the most cost-effective way possible."[7] Farnam's practices did not meet industry trends because Farnam does not meet a conduit exception (78 Fed. Reg. 5566 (Jan. 25, 2013)), which would exempt it from entering into a BAA with Farnam. Maya attempted as recently as September 2025, to restructure its lease with Farnam to avoid the illegal Agreement provisions.

31. Farnam also engaged in false or misleading statements of fact in Section 4, when it represented that it was not only necessary but lawful for Farnam to collect state sales/use tax. Pursuant to the Medicare Manual, as well as Minnesota law, the collection of sales tax is prohibited when the DME at issue is used at home or reimbursed by Medicare or Medicaid. For three (3) years, Farnam invoiced, and Maya paid the state sales/use tax. As a result of Farnam's deceptive and unlawful conduct related to the collection of sales tax Maya was injured and suffered damages.

32. For these deceptive trade practices Maya is entitled to recover its actual damages, costs and disbursements, including the costs of investigation and reasonable attorneys' fees, as well as injunctive relief and other equitable relief, pursuant to Minn. Stat. §§ 8.31, subd. 1 and 3(a).

---

[7] *Supra* n. 4.

**Breach of Contract**

33. A contract is formed when parties (1) exchange bargained-for promises, (2) show mutual assent to this exchange, and (3) support their exchange of promises with consideration. *Med. Staff of Avera Marshall Reg'l Med. Ctr. V. Avera Marshall*, 857 N.W.2d 695, 701 (Minn. 2014). Despite Farnam drafting the Agreement and Maya having unequal sophistication and bargaining power, the Agreement was signed and since September, 2022 Maya has paid Farnam over $775,000, which includes an initial Security Deposit of $55,872.98.

34. Maya is not in default, and it has made its last several payments under protest. There are several issues that arise concerning Farnam's breach of the Agreement. First, it knowingly collected state sales/use tax in violation of Minnesota and federal law. Second, it did not sign a BAA with Maya, despite being able to obtain information related to a DME and an individual patient. Third, the Agreement contains provisions which are illegal under state and federal law. Fourth, Farnam refused to restructure the terms of the Agreement, despite the illegality of certain of its provisions and its commitment to revising the Agreement when revisions were needed and justified.

35. Section 7 of the Agreement is implicated because despite the fact that the fair market value of the DME at the end of the lease will be approximately $0.00 and, in any case, less than the cost of returning it, the Agreement requires that Maya pay the initial cost of the device if it is not returned. In essence, a "double dip of a chip" when after depreciation, there is no ability to resell the device at the same price, if at all. What works for computers – taking it to a store such as Best Buy or an independent computer consultant

12

to have a device returned, does not work with this type of DME because human bodily fluids, whether sweat, blood or another substance, have been in contact with these devices, and family members or patients often discard original packaging.

36. In sum, the illegal sections of the Agreement should be voided, specifically Sections 4, 7 and 12 of the Agreement, a BAA should be signed, and the Agreement should be reformed to reflect the initial meeting of the minds. Maya has upheld its end of the bargain and trusted Farnam, who has only put it at legal and financial risk.

37. An aggregate rental charge must be at arm's length and not exceed that which is reasonably necessary to accomplish the commercially reasonable business purpose of the DME rental. The rental charges imposed by Farnam under the Agreement are not at arm's length, violate federal and state laws and are not on commercially reasonable business terms. Farnam required and Maya was prepared to pay approximately $950,000 in total value. As evidence of Maya's commitment to give Farnam the mutually agreed benefit of the bargain, it has paid approximately $775,000 of the fair market value of the lease that Farnam agreed was - $950,000. Had Maya continued to pay according to Farnam's demands, Farnam would have received approximately $1,430,000 in rent, $470,000 in excess of what Farnam had agreed was a fair market value return on this transaction. Farnam's goal remains to unjustly enrich itself in violation of federal and state law.

# CAUSES OF ACTION

## COUNT 1
## VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### Pursuant to Minn. Stat. § 325D.43, *et seq.*

38. Maya incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

39. The Minnesota Uniform Deceptive Trade Practices Act (MUDTPA) provides "[a] person engages in a deceptive trade practice when, in the course of business . . . the person: . . .

> (13) engages in (i) unfair methods or competition, or (ii) unfair or unconscionable acts or practices; or
>
> (14) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

Minn. Stat. §325D.44.

40. Defendant is a "person" within the meaning of the MUDTPA

41. Defendant willingly engaged in deceptive trade practices, in violation of the MUDTPA, by:

- Falsely or misleadingly advertising that it meets "industry trends;"
- Falsely or misleadingly implying that they met the conduit exception which would exempt it from entering into a BAA;
- Falsely or misleadingly representing that it was necessary and lawful for them to collect state sales/use tax;

14

- Falsely or misleadingly implying that the Agreement complied with applicable state and federal law;

- Falsely or misleadingly implying that delaying the start date of the lease and continuing the payment of interim rent would not materially increase the total amount payable to Farnam under the lease.

42. Defendant knew or should have known that its advertising, statements, representations, and other communications were unfair, unconscionable, and would create the likelihood of confusion or misunderstanding.

43. The facts concealed or not disclosed by Defendant were material facts in that Plaintiff and/or any reasonable person or entity would have to consider them in deciding whether to enter into a lease agreement with Defendant. Had Plaintiff known of Defendant's deceptive business practices, they would not have entered into a lease agreement with Defendant.

44. As a result of Defendant's violations of the MUDTPA, Plaintiff has been injured.

## COUNT II
## BREACH OF CONTRACT

45. Maya incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

46. Minnesota law forbids collection of sales tax for the DME leased by Farnam to Maya under the Agreement.

47. Federal law forbids collection of sales tax for the DME leased by Farnam to Maya under the Agreement.

48. Because Farnam has illegally collected sales tax from Maya, Farnam has breached the Agreement.

49. Federal law requires that leases of DME include aggregate rental charges at arm's length and not in excess of that which is reasonably necessary to accomplish commercially reasonable business purposes.

50. The aggregate rental charges provided for in the Agreement are not at arm's length and are not reasonably necessary to accomplish commercially reasonable business purposes because they materially exceed fair market value, as measured by the value Farnam agreed to receive as the total rental for the DME ($950,000).

51. In addition, Sections 7 and 17 of the Agreement do not take into account the useful life or depreciation of the individual DME, or the DME being off premises and out of Lessee's control.

52. By the end of the lease term, the DME will have a fair market value lower than the cost of returning the DME to Farnam, because of its condition, the fact that it is used and the fact that new, unused and superior quality substitutes are now available at lower prices.

53. The Agreement also requires Maya to return DME, even those devices which have been in contact with bodily fluids and may not lawfully be reused by others, and also

requires Maya to erase, delete and destroy all electronic incidents of software from the DME before returning the DME to Farnam.

54. By including these illegal provisions in the Agreement, Farnam is breaching the Agreement.

55. As a direct and proximate cause of Defendant's breaches of the Agreement, Plaintiff is entitled to equitable relief and to damages.

## COUNT III
## UNJUST ENRICHMENT

56. Maya incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

57. Defendant has been, and continues to be, unjustly enriched by requiring Plaintiff to pay impermissible fees for state sales taxes and will be unjustly enriched if permitted to recover rent in excess of the $950,000 it agreed to accept when it signed the Agreement.

58. Defendant has unjustly benefitted through the unlawful and wrongful collection of fees for state sales taxes and will be unjustly benefitted if permitted to recover rent in excess of the $950,000 it agreed to accept when it signed the Agreement.

59. The amount of the unjust enrichment will be the amount of fees Defendant collects for state sales taxes excessive rent.

60. Plaintiff seeks restitution and disgorgement of Defendant's ill-gotten gains.

## COUNT V

## REFORMATON OF LEASE

61.   Maya incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

62.   As set forth above, the Agreement contains provisions which are illegal under state and/or federal law.

63.   Sections 4, 7 and 12 of the Agreement are illegal and cannot be enforced by Farnam. The provisions of the Agreement which authorize Farnam to be paid more than fair market value for the DME are illegal and unenforceable under federal law.

64.   Section 25 of the Agreement contains the following:

"If any one or more of the provisions of this Lease Agreement or any Lease Schedule is for any reason held invalid, illegal or unenforceable, the remaining provisions of this Lease Agreement and any such Lease Schedule will be unimpaired and the invalid, illegal or unenforceable provisions shall be replaced by a mutually acceptable, valid, legal and enforceable provision that is closest to the original intention of the parties."

65.   Maya is entitled to have the Agreement reformed to eliminate the illegal provisions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered in favor of Plaintiff and against Defendant, as follows:

A. Declare that the Agreement contains illegal provisions as alleged by Plaintiff which are unenforceable and must be stricken from the Agreement;

B. Enjoin Defendant from further enforcement of the illegal provisions of the Agreement;

C. Provide that Plaintiff pay to Defendant no more than the $950,000 Defendant agreed

was fair market value for the DME lease transaction documented in the Agreement; Credit Plaintiff with all payments made to Defendant against the total amount the Court finds to be due to Defendant for leasing the DME including all amounts paid for state sales/use tax;

D. Reform the Agreement by eliminating Agreement Sections 4, 7 and 12 and those provisions requiring Maya to pay more than fair market value for the DME.;

E. Reform the Agreement by setting the lease term to expire in 18 months and providing that Plaintiff pay pro-rata monthly rent to Defendant in the total amount determined by the Court once previous payments, including state sales tax, have been credited;

F. Award Plaintiff their expenses and costs of suit, including reasonable attorneys' fees to the extent available by law;

G. Award Plaintiff pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

H. Award such further relief as the Court deems appropriate.

Dated: February 5, 2026                **Respectfully submitted,**

                                                             /s/David A. Goodwin
Daniel E. Gustafson (#202241)
David A. Goodwin (#386715)
Anthony Stauber (#401093)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, Minnesota 55402
Tel: (612) 333-8844

Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dgoodwin@gustafsongluek.com
tstauber@gustafsongluek.com

Rachel Veronica Rose *(pro hac vice forthcoming)*
Texas Bar No. 24074982
**Rachel V. Rose – Attorney at Law, PLLC**
P.O. Box 22718
Houston, Texas 77227
Email: rvrose@rvrose.com
Telephone: (713) 907-7442

Ralph R. Safford (*pro hac vice forthcoming*)
Michigan Bar No. 24633
**Safford & Baker, PLLC**
5440 Corporate Drive, Ste. 220
Troy, MI 48098
Email: rsafford@saffordbaker.com
Telephone:  (248) 670-0176

*Attorneys for Plaintiff*